**CONSUMERS POWER COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 25586.**

United States District Court
E. D. Michigan, S. D.

March 19, 1969.

Badgley, Domke, Morrison, McVicker & Marcoux by Clifford H. Domke, William O. Allen, Jackson, Mich., for plaintiff.

Richard C. Pugh, Acting Asst. Atty. Gen., Mitchell Rogovin, Asst. Atty. Gen., David A. Wilson, Jr., Donald R. Anderson, Attys., Dept. of Justice, Washington, D. C., Lawrence Gubow, U. S. Atty., Milton Trumbauer, Asst. U. S. Atty., Detroit, Mich., for defendant.

## OPINION

THORNTON, District Judge.

Plaintiff brings this action for refund of Federal Income Taxes paid by it for the years 1954 through 1957. The amount sought to be refunded is $1,213,-483.06, plus interest. During the years involved herein plaintiff was (and still is for that matter) a public utility engaged in the production, generation, transmission and distribution of electrical energy, and the production, purchase, transmission and distribution of natural gas. It was, and is subject to the jurisdiction of the Michigan Public Service Commission.

The parties hereto have stipulated to the necessary jurisdictional facts and this Court has jurisdiction herein. The

parties have also stipulated that if plaintiff is successful herein they will make the computation of the amounts to be recovered.

The case has been presented to the Court on a Stipulation of Facts, a Supplemental Stipulation of Facts, testimony adduced at the trial and exhibits submitted with the stipulations and those introduced at the trial. The Court also has the benefit of a series of briefs submitted by the parties seriatim. Plaintiff requests findings of fact by the Court in addition to those contained in the stipulations. A copy of the Stipulation of Facts and the Supplemental Stipulation of Facts is appended to this Opinion.

At issue for the Court's determination are three grounds of alleged overpayment of tax by plaintiff for the four years in question. We will deal with each of the grounds separately. They represent distinct areas. We will refer to them in the same manner as the parties have done—Advertising Expense, Death Benefit and Depreciation—bearing in mind that as to all three, defendant has disallowed or refused to allow deductions in whole or in part to which plaintiff claims it is entitled. Defendant's position is that there has been no overpayment by plaintiff—that plaintiff is not entitled to the additional deductions claimed by it, and that the partial disallowance of certain advertising expenses was correct.

## ADVERTISING EXPENSE

■ For the four taxable years in question plaintiff deducted as "ordinary and necessary expenses * * *" (26 U.S.C.A. § 162(a)) amounts paid by it to the New York Advertising Agency, N. W. Ayer and Son, Inc., to be used by it in the Electrical Companies' Advertising Program (ECAP).

The basis of the partial disallowance by the Internal Revenue Service of the amounts so paid is found in the Treasury Regulations on Income Tax (1954 Code), § 1.162–15(d). This section was superseded, but not changed, in 1965, for taxable years beginning before January 1, 1963 by § 1.162.20 (26 CFR § 1.162–20). The operative language is:

"Expenditures * * * for the promotion or defeat of legislation * * * or for carrying on propaganda (including advertising) related to any of the foregoing purposes are not deductible from gross income. * * * the cost of advertising to promote or defeat legislation or to influence the public with respect to the desirability or undesirability of proposed legislation is not deductible as a business expense, even though the legislation may directly affect the taxpayer's business. * * * expenditures for institutional or 'good will' advertising which keeps the taxpayer's name before the public are generally deductible as ordinary and necessary business expenses provided the expenditures are related to the patronage the taxpayer might reasonably expect in the future. * * * expenditures for advertising which present views on economic, financial, social, or other subjects of a general nature but which do not involve [the promotion or defeat of legislation * * * or propaganda (including advertising) related to any of the foregoing purposes] are deductible if they otherwise meet the requirements of the regulations under Section 162. * * * Expenditures for the promotion or the defeat of legislation include, but shall not be limited to, expenditures for the purpose of attempting to influence members of a legislative body directly or indirectly, by urging or encouraging the public to contact such members for the purpose of proposing, supporting, or opposing legislation * * *."

■ It is obvious from reading the foregoing that non-deductible is correlative with advertising directed toward the "promotion or defeat of legislation." It is *not* correlative with advertising expressing views on economic, financial or social subjects, per se. Copies of the advertising in controversy are contained in Stipulation Exhibits A through D, as to the magazine media. Also at issue are

some television commercials for the year 1955.

■ In support of its position that the ECAP advertising was legislatively oriented, defendant urges that certain biennial national opinion surveys are revealing of the true motivation of the ECAP. These have been conducted by Opinion Research Corporation, Princeton, New Jersey, directed as to topic by ECAP and N. W. Ayer and Son, Inc. They had as their purpose the measurement of attitudes and changes in attitude of the public toward the private electrical utilities industry and toward the governmental operation of electrical power. Some of the topics bore such headings as "Attitudes Toward Government Ownership," "Socialism," the "TVA and Dixson-Yates," "Atomic Energy and Electricity." While the contents of these surveys may have served as guidelines for ECAP, the yardstick for use here is the language, and its import, contained in the advertising, the expense for which is sought to be deducted by plaintiff as a necessary and business expense. The regulation refers to "expenditures * * * for the promotion or defeat of legislation * * * or for carrying on propaganda (including advertising) related to any of the foregoing purposes * * *." It also refers to "the cost of advertising to promote or defeat legislation or to influence the public with respect to the desirability or undesirability of proposed legislation * * *." The advertising itself must be judged. No matter what the intent of its promulgation may have been, if it is clear of the regulatory prohibition we cannot brand it violative. No matter how criminal a man's intent may be, if he in fact commits no crime a conviction based on his intent cannot be sustained. Although we have made a cursory examination of the surveys submitted as exhibits herein we have preferred to base our judgment here on the advertisements themselves. The expenditures then for which deductions are sought to be allowed were paid to ECAP, and in turn by it to Ayer for the production of certain advertising. Was this advertising in furtherance of promotion or defeat of legislation? Did it constitute propaganda related to such purpose?

■ We have reviewed the eleven "disallowed" advertisements contained in Stipulation Exhibit A (ECAP ADVERTISING 1954), the nine "disallowed" advertisements and seven "disallowed" television commercials contained in Stipulation Exhibit B (ECAP ADVERTISING 1955), the ten "disallowed" advertisements contained in Stipulation Exhibit C (ECAP ADVERTISING 1956) and the nine "disallowed" advertisements contained in Stipulation Exhibit D (ECAP ADVERTISING 1957). A fair reading of these, both individually and collectively, compels the conclusion that they belong to the non-deductible category within the purview of § 1.162–20. Repeated reading of the advertisements only serves to reinforce this conclusion. The impact of the adroitly worded presentations seems to us to come within the ambit of non-deductibility under § 1.162–20. In order to gain an appreciation of the gist of the advertisements it is necessary to read each advertisement in toto. We will, therefore, append hereto copies of three of the "disallowed" advertisements selected on the basis as to what strikes us as presenting a fair range from least purposeful to those most purposeful. Plaintiff suggests that "if by some stretch of imagination there is any merit to the Defendant's position, that the Plaintiff is prohibited from deducting all of the costs of advertisements which relate to government-operated utilities, it is inequitable and unfair to penalize the Plaintiff to the extent of disallowing the deduction of the cost of the entire advertisement, merely because in the mind of the Defendant a single sentence relates to government-operated utilities. If any amount is to be disallowed, and we submit that no amount should be disallowed, the disallowance should be limited to total linage or total wordage which relates to government-operated utilities."

We think that the suggestion, if followed, would do violence to the purpose and

intent of the regulation. A "cutting and pasting" job if contemplated by the regulation needs to be spelled out. No such procedure is spelled out in § 1.162–20 nor implied therein.

We should not fail to comment on the cases cited by plaintiff in its brief. It relies heavily on Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). In *Tellier* the taxpayer sought to deduct as an "ordinary and necessary expense" legal expenses in the amount of $22,964.-20 incurred in his unsuccessful defense of a criminal prosecution. The taxpayer's business was underwriting the public sale of stock offerings and purchasing securities for resale to customers. He was prosecuted for violating the fraud section of the Securities Act of 1933 and the mail fraud statute. The Court, speaking through Mr. Justice Stewart, said that "there can be no serious question that the payments deducted by the respondent were expenses of his securities business under the decisions of this Court, and the Commissioner does not contend otherwise." The Commissioner's position was that the expenditures should have been disallowed "on the ground of public policy." Justice Stewart said that this view "finds no support, however, in any regulation or statute or in any decision of this Court, and we believe no such 'public policy' exception to the plain provision of § 162(a) is warranted in the circumstances presented by this case." We fail to see any analogy to the instant matter. We fail to see how any language contained in that opinion is relevant to the case at bar. The case contains no reference to, nor does it mention § 1.162–20. In its brief plaintiff distinguishes the instant case from a group of seven or eight cases cited by the defendant herein. We do not base our conclusion on the holdings in these cases. Each was decided on a set of facts quite distinct from those here present, except perhaps for Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), which involved expenditures directed at a pending state referendum.

Plaintiff's brief is a persuasive one, but it does not meet the regulation head-on. It skirts it, albeit effectively. We have reached our conclusion here by the simple process of applying the unambiguous language of the regulation to the "disallowed" advertising. In so doing there is, in our opinion, only one possible result. The plaintiff cannot prevail.

## DEATH BENEFIT

A statement of the issue in the above-captioned area is best given here by drawing upon the plaintiff's own language as it appears in its briefs. We set forth below the factual background, together with plaintiff's argument, in language that is a combination of plaintiff's and the Court's.

The death benefit issue involves the amount deductible for Federal Income Tax purposes during each of the taxable years 1955, 1956 and 1957. The plaintiff claims that all events had occurred by the end of each of these years to establish the fact of its liability to its retired employees (as a result of the issuance of Death Benefit Certificates to these employees), and that the amount of such liability could be determined with reasonable accuracy.

Prior to the year 1955 the plaintiff provided death benefit payments usually in the amount of $1,000, to the beneficiaries of its retired employees upon the death of such retired employees. This death benefit program was insured and the plaintiff's premium payments to the insurance company were allowed as a deduction for income tax purposes by the defendant. Starting in 1955 the plaintiff continued its death benefit program, but changed the method of financing to that of a self-insured plan.

Plaintiff claims:

That the death benefit certificate unconditionally obligated the plaintiff to pay the death benefit upon the occurrence of an event which was certain to happen—the death of the

retired employee—and that, therefore, on the last day of each of the years 1955, 1956 and 1957 the plaintiff had an actuarially determined obligation to pay death benefits on account of those employees already retired and to those employees to be retired in the future;

that this obligation with respect to plaintiff's retired employees was fixed and vested and could only be discharged by payment of the death benefit upon the employee's death; and,

that it is entitled to deduct at least the face amount of the certificates it delivered to retiring employees each year.

Plaintiff has placed in the record an actuarial determination of the present value of the outstanding certificates at the end of each year, to be used if it be determined that the plaintiff would be entitled to a deduction equal to the present value of the delivered certificates, and contends that it should be entitled to deduct in each of the years 1955, 1956 and 1957 an amount equal to the annual increase in present values of the Death Benefit Certificates delivered and outstanding.

The plaintiff's Death Benefit Plan arose out of a labor dispute with its Union employees and the recommendation of a Special Commission under the Michigan Labor Mediation Act that the parties agree to a contract provision whereby the Company provides life insurance or death benefits of $1,000 for all retired or retiring employees. This agreement was adopted by the Union and Company on September 22, 1955, and provides in part as follows (Exhibit DD):

"Each full-time regular employee who works to or after his Normal Retirement Date on or after March 1, 1955 will be included in the Plan. [Sec. II, par. 1]

\* \* \* \* \* \*

Each eligible employee will be permitted to designate a payee or payees of the Benefit and in the absence of such designation the Benefit shall be payable to his estate. [Sec. III par. 1]

\* \* \* \* \* \*

Each eligible employee on retirement will be given a certificate by the Company indicating his eligibility for the Benefit under the Plan.

Payment of Benefits will be made by the Company on receipt of a properly executed claim form signed by the designated payee or payees and accompanied by a certified copy of the Death Certificate of the deceased retired employee. [Sec. V, pars. 1, 2.]"

With respect to the contentions of defendant we set them forth below in the language of its briefs, in combination with some of our own language:

Defendant contends that there are three issues presented by the plaintiff's claim for deductions in 1955, 1956 and 1957 of accrued liabilities under its Death Benefit Plan as follows: (1) Whether, under Section 404(a) (5) of the Internal Revenue Code of 1954, the plaintiff is entitled only to the deduction of the benefits actually paid during the year, which it claimed and was allowed on its return; (2) whether, if Section 404(a) (5) is not applicable, the plaintiff was otherwise entitled to a greater deduction; and (3) the proper amount of any greater deduction.[1]

---

1. Section 404 of the Internal Revenue Code of 1954, 26 U.S.C., 1964 ed., provides: "(a) General Rule.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income) ; but, if they satisfy the con-

Re Section 404(a) (5) the defendant contends:

That Section 404(a) (5) requires that regardless of other rules of accounting, compensation paid or accrued on account of any employee under a plan deferring the receipt of such compensation is deductible only in the taxable year when such compensation is actually paid to the employee or his beneficiary;

that Section 404(a) (5) excises such arrangements as the plaintiff's from the normal rules of tax accounting, regardless of whether the taxpayer is on a cash, accrual or other method of accounting;

that a deduction is allowable only in the year of payment, and then only if the employee's rights are nonforfeitable;

that, therefore, the defendant holds that the commuted value of the unpaid balance of the obligation was not deductible before its actual payment;

that Section 404(a) (5) is an application of the long standing rule designed to forestall tax avoidance, that compensation to be paid in the future on account of an employee must be irrevocably set aside by an employer before it is deductible. Compensation is paid, within the meaning of Section 404(a) (5), at the time the funds are paid or made available to the employee. With respect to that section, which was adopted without change from the 1939 Code, the House Committee Report on the 1954 Code further stated that

"[t]he employer cannot take a deduction when he makes his contribution unless the benefits are immediately paid to the employee." (H.Rept. No. 1337, 83d Cong., 2d Sess., pp. 43–44);

that plaintiff's Death Benefit Plan originated in collective bargaining between plaintiff and its employees' Union, regardless of whether or not the plaintiff considers it merely burial insurance for the family;

that as death benefits, plaintiff's payments clearly were compensation paid on account of any employee under a plan deferring the receipt of such compensation;

that Treasury regulations on Income Tax (1954 Code) expressly provide that "Section 404(a) also governs the deductibility of unfunded pensions and death benefits paid directly to former employees or their beneficiaries" (Sec. 1.404(a)–1(a) (1), 26 C.F.R. Sec. 1.-404(a)–1(a) (1)), and that "if amounts are paid as a death benefit to the beneficiaries of an employee (for example, by continuing his salary for a reasonable period), * * * such amounts are deductible under section 404(a) (5) in any case when they are not deductible under the other paragraphs of section 404(a)." (Sec. 1.404 (a)–12, 26 C.F.R. Sec. 1.404(a)–12);

that plaintiff's contention that Section 404(a) (5) is limited to benefits received by the employee during his life is refuted by the statute itself which speaks of "compensation

ditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

(1) Pension trusts.—In the taxable year when paid, if the contributions are paid into a pension trust, and * * the trust is exempt under section 501(a) * * *.

(2) Employees annuities.—In the taxable year when paid * * * if the contributions are paid toward the purchase of * * *.

(3) Stock bonus and profit-sharing trusts.—* * * In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and * * * the trust is exempt under section 501(a) * * *.
* * * * *
(5) Other plans.—In the taxable year when paid, if the plan is not one included in paragraph (1), (2), or (3), if the employees' rights to or derived from such employer's contribution or compensation are nonforfeitable at the time the contribution or compensation is paid. * * * "

paid or accrued on account of [not 'to'] any employee";

that regardless of whether from the institution of its Death Benefit Plan in 1955, or after an employee's retirement at or after the age of 65, or only after the retired employee's death, the plaintiff became obligated to pay the benefit to the employee's beneficiary, the plan was a plan deferring the receipt of such compensation and under Section 404(a) (5) the benefit was deductible by the plaintiff only when the plaintiff actually paid it to the beneficiary.

The question as to what is and what is not deferred compensation cannot be stretched to include any consideration of the Death Benefit Plan of plaintiff. Nor do the provisions of Section 162 and/or 212 of the Internal Revenue Code have any affinity for the plaintiff's Death Benefit Plan so as to place the plan within the "catch-all" provisions of Section 404(a) (5). John C. Nordt Co., 46 T.C. 431, 441 states that:

"Section 404(a) (5) is a 'catch-all provision' intended to cover plans which do not fall into the formal categories (such as pension trusts, employees' annuities, and stock bonus and profit-sharing trusts) described in paragraphs (1), (2), and (3) of subsection (a). * * *"

No testimony was adduced in this proceeding that in any way associated plaintiff's Death Benefit Plan with a continuance of the salary of any retired employee of Consumers for *any* period of time, reasonable or otherwise. It is conceded by defendant, and it is readily apparent, that plaintiff's Death Benefit Plan evolved from an "arm's length transaction" between the Company and the employees' Union, upon the recommendation of a Special Commission appointed by the Governor of the State of Michigan under the Michigan Labor Mediation Act (Act 176 of Public Acts of 1939). The Special Commission's primary function was to aid management and labor, through the process of mediation, in reaching amica-

ble settlements of labor disputes then pending between the employees' Union and the plaintiff. This recommendation by the Special Commission produced the following resolution (adopted September 22, 1955), have as Exhibit CC, by the Board of Directors of Consumers Power Company:

"Report was made that on May 13, 1955, the Special Commission appointed by the Governor of the State of Michigan in the matter of the dispute between the company and the Utility Workers Union of America, C.I.O., recommended payment by the company of life insurance or death benefits of $1,000 for all retired or retiring employees within the bargaining unit; and that the officers of the company agreed with the union to the payment of death benefits in conformity with the recommendation of the Special Commission. It was further reported that the officers of the company formulated a Death Benefit Plan for all employees of the company, effective March 1, 1955, a copy of which was presented to the meeting. Under the Plan, each full-time regular employee who works to or after his normal retirement date and each such employee retiring under the company's Pension Plan with the consent of the company because of total and permanent disability, will be eligible for the benefit. The benefit payable to the designated payee on the death of an employee retiring on or after March 1, 1955 will be $1,000 or the amount for which he was eligible under an existing group life insurance plan put into effect on July 1, 1944, if greater. The maximum amount payable under the existing insurance plan is $2,000.

Upon motion duly made and seconded, the following resolution was thereupon unanimously adopted:

RESOLVED: That the Death Benefit Plan for the company's employees in the form submitted to this meeting be and hereby is approved and that the officers of the company be and hereby

are authorized to do all things necessary to carry out the Plan.

\* \* \* \* \* \*

I, P. A. Perry, Assistant Secretary of Consumers Power Company, do hereby certify that the foregoing is a true and correct copy of preamble and resolution duly and regularly adopted at meeting of the board of directors of Consumers Power Company duly held on September 22, 1955, at which a quorum was in attendance and voting throughout and that said preamble and resolution have not since been rescinded but are still in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company this 9th day of November, 1965."

The findings and recommendations of the Special Commission, here as Exhibit BB, that had to do with the foregoing resolution by the Company recites the following:

"UNION PROPOSAL NO. 40

*(Insurance for Retired Employees)*

'The Company to provide $1500 life insurance for each retired and retiring employee.'

We have stated in connection with Union Pension Plan Proposal No. 9 our view that the parties should negotiate life insurance benefits for retired and retiring employees. In our opinion the Company does owe some responsibility in this regard to retired and retiring employees, although less than to employees on the payroll. Because of the cost of insurance for older persons companies which provide life insurance for retiring employees generally do so at a reduced amount. In the case of some companies it may be more economical to pay a death benefit directly rather than covering the risk by insurance.

*Recommendation*

The Commission recommends that the parties agree to a contract provision whereby the Company provides life insurance or death benefits of $1,000 for all retired or retiring employees."

The Death Benefit Plan itself, here as Exhibit DD, is devoid of any mention of "deferred compensation" and is equally devoid of any writing that would permit an inference from which a conclusion could be drawn that the plan had anything to do with deferred compensation.

We have purposely given defendant's argument (that the plaintiff's Death Benefit Plan encompasses "deferred compensation") extensive exposure because it is difficult for us to understand how the defendant can advance such an argument in view of the absence of any testimony, on direct or cross examination, to support such a theory, and in view of the modus operandi of the plan during the taxable years in question. When we add to the foregoing the statement by Judge Arundell of the Tax Court in John C. Nordt Co., *supra*, at page 442, that "[n]either the regulations nor the Code itself purports to answer the question of what constitutes 'a [Death Benefit] plan' under Section 404(a) (5)," we are at a loss to comprehend how the defendant can so easily place it in Section 404(a) (5) as deferred compensation. Section 404(a) (5) must be the catch-all to end all catch-alls.

Defendant readily concedes that plaintiff's Death Benefit Plan is not encompassed by (1), (2), or (3) of Section 404 (a). It does not so concede as to Section 404(a) (5). It is the conclusion of the Court, however, that it was not a plan deferring the receipt of compensation and, accordingly, was not a plan limiting the plaintiff to deductions for only the amount of the benefit paid to the beneficiary at the time of actual payment.

In Commissioner of Internal Revenue v. Champion Spark Plug Company, 266 F.2d 347 (6th Cir. 1959) we find the following:

"Briefly stated, the salient facts are that the board of directors of the respondent corporate taxpayer adopted a resolution in the latter part of 1953,

directing the payment of $33,750 to a totally disabled salesman-employee (or, in the event of his death, to his widow) as a substitute for a policy of insurance on the salesman's life which it had unsuccessfully attempted to secure under a pension plan; and the Tax Court considered that the authorized payment by the corporate taxpayer to its employee was an unconditional obligation to pay a business expense upon the adoption of the resolution by the directors on December 16, 1953. The court considered that the obligation became then 'accrued', as the taxpayer, during 1953, had kept its books and reported its income in compliance with the accrual method of accounting.

The United States Tax Court held that, in the circumstances of the case, the authorized payment to respondent's employee was a deductible business expense for the year 1953, although the sum authorized to be paid was payable to the employee in sixty equal semi-monthly instalments, beginning January 15, 1954.

We believe that the tax court reached a correct result, upon the basis of its findings of fact and opinion. Accordingly, its decision is affirmed."

The tax court, in *Champion*, had stated the following:

"We are convinced that a study of the entire record shows that Badger had been fully paid for past services and the authorized payment was not compensation for any services rendered to the petitioner. It was to alleviate the financial hardship suffered as a result of his fatal illness. Petitioner, with commendable solicitude for the sad plight of a faithful employee, felt some measure of obligation due to the fact that his assigned position had resulted in his loss of insurability. Petitioner's discharge of the obligation in the manner revealed by this record was not the payment of compensation under any plan deferring the receipt of compensa-

tion such as to render section 23(p), or the quoted regulations, applicable. * * *" Champion Spark Plug Co., 30 T.C. 295, 300 (1958).

As an alternative theory (alternative to the theory of deferred compensation), the defendant contends:

That if Section 404(a) (5) did not apply to the plaintiff's Death Benefit Plan and prohibit any deduction before actual payment of the benefit to a retired employee's beneficiary, the plaintiff was not otherwise entitled to deduct any "accrued liability" under the plan;

that Section 461, Internal Revenue Code of 1954, provides that a deduction shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income; [2]

that for a taxpayer computing its taxable income by the accrual method it has long been held that in order truly to reflect the income of a given year, all the events must occur in that year which fixed the amount, and the fact of the taxpayer's liability for the items of indebtedness deducted though not paid;

that under this fundamental principle of tax accounting, a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent.

In support of this theory defendant relies upon Dixie Pine Products Co. v. Commissioner of Internal Revenue, 320 U.S. 516, 519, 64 S.Ct. 364, 88 L.Ed. 270 (1944); United States v. Consolidated Edison Co., 366 U.S. 380, 385, 81 S.Ct. 1326, 6 L.Ed. 2d 356 (1961); and Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 284, 64 S.Ct. 596, 88 L.Ed. 725 (1944). This Court certainly has no quarrel with the legal proposition for which these three opinions stand as it pertains to the facts under consideration by the Supreme Court in each of the three cases. However, the facts in the

---

2. The parties have stipulated that for 1955, 1956 and 1957 the plaintiff filed its corporate tax returns using the accrual method of accounting.

three cited cases are as foreign to the facts in this case as a fish is to feathers.

> "Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960)

Continuing with its alternative theory defendant invokes Treasury Regulations on Income Tax (1954 Code) Section 1–461–1(a) (2) providing that:

> "Under an accrual method of accounting, an expense is deductible for the taxable year in which *all the events* have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." (Emphasis supplied)

and argues that strict adherence to this "all events" test for revenue purposes is necessary "to prevent the permanent exemption of income of a continuing business from payment of tax."

Plaintiff's answer to defendant's "all events" theory is that all the events *had* occurred in each of the taxable years in question to establish the fact of liability to its retired employees, and that the amount of such liability could be determined with reasonable accuracy.

The posture of this aspect of the case is perfectly clear—the defendant contending that a certain test must be met in order to sustain plaintiff's tax theory, and the plaintiff contending that it has fully met the test.

Of assistance to us in arriving at a proper determination of this issue is United States v. Anderson, 269 U.S. 422 at page 441, 46 S.Ct. 131 at page 134, 70 L.Ed. 347 (1926) in which we find the following:

> "In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. * * * "

Peninsular Metal Products Corporation, 37 T.C. 172, 178–179 (1961), concerns a situation where the taxpayer's liability had become "fixed, absolute and unconditional" by virtue of a 1956 agreement, and the Court there held that the "all events" test was satisfied and the taxpayer should prevail. We quote below from this case:

> "Petitioner cites *Champion Spark Plug Co.,* * * * as being a case very closely in point to the issue here involved. * * * In the instant case the respondent, in contending that petitioner is not entitled to deduct any amount in 1956, argues that the agreement of March 17, 1956, was a *modification* of the prior employment agreement of July 28, 1954. There is no merit in this argument. The agreement of July 28, 1954, was 'terminated for breach, effective immediately' on January 19, 1956, at which time Burgess was removed as president and general manager of the petitioner. Burgess and his attorney protested the discharge of Burgess and the cancellation of his contract. A definite and clear-cut dispute arose between petitioner and Burgess. Petitioner claimed it had discharged Burgess and canceled his contract because Burgess had been guilty of numerous and serious defaults in the performance of his employment agreement and had breached his employment agreement, all of which was denied by Burgess. In order to settle the controversy amicably, petitioner and Burgess entered into the agreement of March 17, 1956. This agreement was in no way a modification or revision or a continuation of the employment agreement of July 28, 1954, but was a separate, distinct, and definite agreement executed between petitioner and Burgess to settle amicably the controversy which had arisen between them, whereby petitioner became absolutely liable to pay Burgess the then-determined amount of $117,-400. The agreement of March 17, 1956,

was not subject to any contingencies or conditions. Burgess was not obligated or required to render or perform any services or refrain from doing anything. The liability to Burgess was fixed, absolute, and unconditional whether Burgess lived or died. All the events had occurred in 1956 which determined the fact of petitioner's liability to pay Burgess $117,400 as liquidated damages. We think the instant case is substantially on all fours in principle with *Champion Spark Plug Co., supra.*

For the reasons previously given, we hold that petitioner is entitled to deduct the full amount of $117,400 from its gross income in its income tax return for the year 1956. * * * "

From all the foregoing the Court concludes that when plaintiff issued a Death Benefit Plan Certificate to a retired or retiring employee of the Company during any of the years 1955, 1956 or 1957, then and at that time its liability under the provisions of the Certificate was clearly established; also, the amount of said liability *could* be determined with reasonable accuracy. The Plan, therefore, met the "all events" test set forth in Treasury Regulations on Income Tax, 1954 Code, Section 1.461–1(a) (2).

Since plaintiff has conformed to the "all events" requirement of the tax regulations, it is entitled to deduct the face amount of each Death Benefit Plan Certificate issued to a retired [3] employee of the Company for the year of issuance—1955, 1956 or 1957.

## DEPRECIATION

The Internal Revenue Code of 1954 provides for the allowance of depreciation as a deduction from gross income, as follows:

"(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

* * * "

(26 U.S.C.A. § 167)

The substantive issue under the depreciation heading involves plaintiff's right to take deductions in computing Federal income for:

A. depreciation on its "costs of initial electric transmission line clearing sustained in the year 1957 in the amount of not less than $100,727.00" [4] and

B. depreciation on its "costs of right-of-way easements sustained in the year 1957 in the amount of not less than $188,045.00." [5]

We will refer to A and B above as clearing costs and easement costs, respectively. The clearing costs were capitalized and carried in a separate plant account. The costs of the easements also were capitalized and were carried in three separate plant accounts. In its Complaint plaintiff states, at pages 8–9, that "[t]he average amount in its plant account for such initial clearing for the construction of electric transmission lines for the year 1957 was not less than $4,116,397.00. Such amount represents the amount which the Plaintiff paid in wages to have trees and shrubs cut as a necessary and integral part of the construction of an electric transmission line so as to set the towers and poles and keep such towers and poles and the electric wire conductor free of any contact by trees and shrubs. The land is not improved for rough stumps remain after the clearing."

Plaintiff goes on to state that during its existence many electric transmission lines have been retired from service and that as a result the costs of initial clearing are retired from service.

3. or retiring.

4. Complaint, paragraph 6(3).

5. Complaint, paragraph 6(4).

Plaintiff states that these retirements from service "will continue in the future at least as rapidly as in the past, and in amounts of not less than the amounts involved in the past." [6]

The depreciation taken by plaintiff for clearing costs on its books of account in 1955 was upon the basis of a 75-year life. The Michigan Public Service Commission approved such book accounting. Plaintiff states in paragraph 26 of its Complaint that the "application of an accepted formula used for determining the useful life of depreciable property for Federal income tax purposes, indicates a useful life at the end of the year 1957 of not more than 75 years." Plaintiff goes on to say in paragraph 27 that "[i]n the alternative, the useful life of the Plaintiff's initial electric transmission line clearing costs is the same as the assets with which they are associated, namely, the towers, poles and conductors, which in the Plaintiff's case is a 51-year life." The plaintiff makes the observation that the purpose of depreciation is to allocate to each accounting year a proportion of the initial cost of an asset "so that over the life of the asset there would be reflected its loss of value due to wear and tear, including the destructive force of the elements, and obsolescence." Obviously obsolescence must be anticipated, and its rate cannot be projected with precision. Plaintiff states in paragraph 28 of its Complaint that its "initial electric transmission line clearing costs will become obsolete in the future as in the past, but to a *greater degree in the future* [emphasis supplied] than in the past, by reason of any one of numerous technological and economic obsolescence factors existing in the electric public utility field. Such factors include, among others, new extremely high voltage transmission lines, changes in design of transmission line poles and towers, and the generation of electric energy by means of nuclear reaction, fuel cells, solar cells, magneto-hydrodynamic and thermionic methods."

■ It is plaintiff's claim in relation to the clearing costs as set forth in paragraph 29 that it "is entitled under the provisions of section 167 of the Internal Revenue Code of 1954, as amended, and Income Tax Regulations § 1.167, to a depreciation deduction based upon the gradual day-by-day economic obsolescence of its initial electric transmission line clearing costs over a period of 51 years and in the amount of not less than $100,727.00 in computing its Federal income tax liability for the year 1957."

The answer of defendant to plaintiff's Complaint re all the allegations in paragraphs 23–28 (those relating specifically to clearing costs), is that defendant is "without knowledge or information sufficient to form a belief" as to their truth. As to paragraph 29 (the last paragraph relating specifically to clearing costs) defendant's answer is that it "denies the allegations of paragraph 29."

The fundamental dispute between the parties here appears to be one having to do with degree of accuracy of prediction concerning obsolescence. Plaintiff argues that the Commission requires much greater accuracy in the projection in the life of intangible assets than of tangible assets—that because "exhaustion, wear and tear" of tangible assets can be fairly accurately predicted and therefore allowed greater leeway, the formula for predicting obsolescence of intangible assets must be tied down with greater certainty. Plaintiff argues, in hocus-pocus fashion, that the assets involved herein are tangible and not subject to what it deems to be the stricter rule for intangibles. It uses various references in support of this position, such as the application of the State of Michigan's property tax and the view taken by the Michigan Public Service Commission. It should be noted that in the cases cited by plaintiff, including some as recently as the summer and fall of 1968, the Court treated and referred to easements and clearing costs as in-

6. Complaint, paragraph 24.

tangible assets. We do not deem it necessary to make a determination here that they are one or the other.

Since the date of the trial plaintiff has called to the attention of the Court several recent decisions involving depreciation, by utility companies, of the kind of assets we are here talking about. These cases are as follows:

Badger Pipe Line Co. v. United States, October 15, 1965, U. S. Court of Claims

Great Lakes Pipe Line Co. v. United States, August 15, 1965, U. S. District Court, W.D.Mo.

Texas-New Mexico Pipe Line Co. v. United States, October 18, 1968, U. S. Court of Claims, 401 F.2d 796

Commonwealth Natural Gas Corp. v. United States, 395 F.2d 493 (C.A.4, May 7, 1968)

Oklahoma Gas & Electric v. United States, August 9, 1968, U. S. District Court, W.D.Okla., 289 F.Supp. 98

Panhandle Eastern Pipe Line Co. v. United States, June 18, 1968, Commissioner's Opinion

Pennsylvania Power & Light Co. v. United States, July 30, 1968, Commissioner's Opinion

Virginia Electric & Power Co. v. United States, October 16, 1968, Commissioner's Opinion

We have read these decisions and find them apposite. Prior to any further discussion of them we will here pause to comment briefly on some, if not all, of the six witnesses whose testimony supported the position of plaintiff, and the one witness upon whose testimony the government relies. We will advert to the final argument of counsel summarizing the positions taken by them for their respective clients. Finally, we will draw upon the decisions above-cited for what we consider to be statements of the law that apply as forcefully to the situation of this plaintiff as they did to the plaintiffs in those cases.

The Court heard testimony from Mr. Russell C. Youngdahl on the depreciation issue. Mr. Youngdahl's position with Consumers Power at the time he testified was Executive Manager of Engineering Construction. For the purpose of giving a fair picture of Mr. Youngdahl we here set forth testimony from the transcript reflecting what transpired upon his first taking the witness stand. (Tr. 230–233)

"Q. Your full name, please?

A. Russell Charles Youngdahl.

Q. Mr. Youngdahl, what is your home address, please?

A. 1747 Oaks Drive, Jackson, Michigan.

Q. What is your present position?

A. Present position is Executive Manager of Engineering Construction with the Consumers Power Company.

Q. How long have you held this position, Mr. Youngdahl?

A. About three days.

Q. Prior to three days ago, what was your position, sir?

A. Prior to Tuesday of this week I was Executive Manager of Electric Operations for the Consumers Power Company.

Q. I take it this is a promotion?

A. Yes.

Q. Congratulations.

A. Thank you.

Q. How long have you been associated with Consumers Power Company?

A. Since 1946.

Q. In what capacities?

A. Initially as a Junior Engineer; then as a Field Engineer; then as Division Engineer; as an Operations Supervisor; as an Assistant Superintendent; as Electric Distribution Superintendent; as Assistant General Supervisor of Electric Operations; and most recently as Executive Manager of Electric Operations.

Q. Now, as Executive Manager of Electric Operations up until two or three days ago, will you please

describe, briefly, the duties of your position?

A. Yes. I reported directly to the Vice President of Electric Operations, and all of the department then reported through me to him, and we are responsible for electric generation in the Consumers Power Company; the electric distribution and transmission system for Consumers Power Company; the bulk power planning for Consumers Power Company, the electric budgets and planning for the Consumers; coal purchases, and the forestry departments.

Q. What is your professional education?

A. I have a Bachelor of Science from the University of Michigan, Electrical Engineering, and a Master of Industrial Management from M.I.T., Massachusetts Institute of Technology.

Q. Are you a member of any professional societies?

A. Yes. The I.E.E.E., and it stands for the Institute of Electrical and Electronic Engineers.

Q. Mr. Youngdahl, for your convenience in answering the next question we have enlarged Exhibit LL and put it over on an easel, and we have a pointer for your use if you wish to use it.

Will you please describe, briefly, the company's electric transmission system as it existed in 1957?

A. All right. Consumers' electric system in 1957—and this is a map of 1957—supplied energy to, basically, the Lower Peninsula, with the exception of the Thumb area, the Detroit area, and this piece of Michigan near the Lake and Indiana.

There were some 33 hydro plants, eight fossil-burning plants, and two Diesel plants that generated electricity, along with three interconnections to the Detroit Edison system.

Q. Could I interrupt you for a moment? What is a 'fossil-burning plant'?

A. Excuse me. Coal. Coal-burning plant.

The purpose of the transmission system was to interconnect these generating facilities throughout the State and deliver the electrical energy to other points of need of utilization.

Actually, there is a step-down area, because the transmission system generally does not service customers per se, but supplies service to sub-stations, which sets it down to a lower utilization voltage, which, in turn, is stepped down again to supply service to the ultimate user."

After describing briefly the company's transmission lines Mr. Youngdahl's testimony included statements to the effect that there would be an acceleration of retirements of electric transmission lines in the state because of the "growth of Michigan and the technological changes that are taking place in the field of generation and interconnection of systems." (Tr. 263) He testified that the company's electric transmission easements have a limited life because the transmission system "is not a static thing." (Tr. 263) Mr. Youngdahl described the plaintiff's electric distribution system as it existed in 1957. He then testified that electric distribution easements traverse approximately the same types of area as electric transmission easements and are subject to "substantially the same mortality causes as electric transmission easements" (Tr. 270) and that they have a life which tends to be shorter than the electric transmission easements because "they have a greater exposure to being moved, to being changed, than the transmission system." (Tr. 271) He also testified that obsolescence accounts for approximately 80%

of retirement of the company's electric plant (Tr. 272). "This would apply to the entire system. The generating units, the transmission system, and the distribution system." (Tr. 272)

Another witness called by plaintiff was Mr. John Simpson who testified upon taking the stand, as follows: (Tr. 303)

"Q. Your full name, please?

A. John Simpson.

Q. Mr. Simpson, what is your home address?

A. 3958 Fayette Court, Jackson, Michigan.

Q. What is your occupation?

A. I am Vice President in charge of Gas Operations for Consumers Power Company.

Q. How long have you been employed by Consumers Power Company?

A. In excess of twenty years.

Q. In what capacities, sir?

A. Well, I came with the company in 1946 as a Junior Engineer; Transferred to our subsidiary, Michigan Gas Storage Company in 1947; In 1950 or '51 I was made Assistant General Superintendent of Michigan Gas Storage Company; And in 1952 I returned to Consumers Power Company as General Supervisor of Gas Operations.

In 1958 I was appointed to my present position.

Q. And you are still vice president?

A. Yes, sir.

Q. In charge of Gas Operations?

A. Yes, sir.

Q. Are you a registered engineer?

A. Yes, sir, I am, in the State of Michigan.

Q. Please describe, briefly, the duties of your position?

A. Well, I am in charge of the acquisition of gas supply; planning; construction; operation and maintenance of our integrated natural gas system.

Q. Does this include the distribution system?

A. Yes, sir, it does."

Mr. Simpson then proceeded to give a description of the gas distribution system of plaintiff as it existed in 1957. He testified that the gas distribution system consisted "primarily of two types of facilities" (Tr. 304)—the distribution grid running up and down the city streets "from which the service pipe to each individual customer's home or place of business is run" and the supply mains "which take the gas into the distribution grid." (Tr. 304) When asked what causes there were for relocating or abandoning gas distribution mains, Mr. Simpson replied "Well, there are two main reasons. One is corrosion or deterioration of the pipe such that it is no longer safe to use and must be retired or abandoned because of a leaking condition; or, secondly—and perhaps the one that is the reason that rules most of the time—is obsolescence." (Tr. 310) Asked whether the cost of a gas distribution easement constitutes a part of the cost of the main which is installed in it, Mr. Simpson replied in the affirmative. Mr. Simpson testified that many new gas easements had been necessary in order to add new mains, and he submitted a schedule prepared by him showing the amount of gas distribution mains retired for 1953–1965 (Exhibit NNN)—over 900 miles of distribution mains. He was asked what happened to the mains upon retirement, and his answer was that "practically all of it was just left in place and abandoned." (Tr. 315) He had previously explained why retired mains must be abandoned and cannot as a practical matter be removed—the cost of removal being more than the salvage value. He also testified that when old mains wear out it is not possible to lay new ones over them. He testified that the life of these distribution easements is the same as the supply mains (Tr. 320)—that the type of pipe used by the company in the last 15 years for supplying mains has been "exclusively coated and wrapped steel pipe." (Tr. 320)

A witness called by plaintiff, who held no position with plaintiff and who testified that plaintiff had not been a client of his company prior to employment in this case, impressed this Court as a person thoroughly competent in his field, whose judgment may not be lightly questioned. He is Mr. John J. Reilly. His competency and qualification can best be presented by the portions of the transcript hereinafter set forth: (Tr. 483–489)

"Q. Will you state your name and address, please?

A. My name is John J. Reilly, and my place of residence is Roslyn Heights, Long Island, a suburb of New York City.

Q. What is your occupation, Mr. Reilly?

A. I am an employee of Ebasco Services Incorporated, and hold the position of Director of Valuation and Appraisal Services.

Q. Can you describe your duties—

A. (Interposing) As Director of these Services, I am responsible for the preparation and supervision of all valuation and depreciation studies.

Q. What kind of organization is Ebasco Services?

A. Ebasco is a wholly-owned subsidiary of Electric Bond and Share Company. It has provided consulting engineering, design, construction, and management consultation services to utility companies and governments for the past sixty years.

It is one of the largest designers and constructors of steam electric and hydro-electric power plants.

Q. Prior to your employment in this case, Mr. Reilly, has Consumers Power Company been a client of Ebasco?

A. No, it has not.

Q. Have you prepared a resume of your education and professional experience?

A. Yes, sir, I have.

MR. ALLEN: Mark this, please.

(A booklet entitled, 'Resume of Education and Professional Experience of John J. Reilly,' was thereupon marked Plaintiff's Exhibit YYY by the Reporter.)

Q. (By Mr. Allen, continuing) Mr. Reilly, I hand you what has been marked for identification as Exhibit YYY. Will you identify it for us, please? (Handing exhibit to the witness.)

A. This exhibit is a brochure which contains a resume of my education and professional experience.

Q. So the Court will have a general idea of your qualifications, Mr. Reilly, will you summarize, briefly, your education and professional experience?

A. I am a graduate of Ohio University, with a degree of Bachelor of Science in Civil Engineering in the year 1932.

I also completed graduate courses in Power Plant Engineering at Columbia University during '39 and '40.

During the period '33 to '37, I worked for the City of New York as a Structural Design Engineer.

I was employed by Ebasco Services, Incorporated, as a Power Plant Design Engineer in April 1937. Since 1937, except for a two-year period of service in the Navy, I have been continuously employed by Ebasco, and was appointed to my present position in 1954.

During the major part of the 30-year period, I have been engaged in engineering work closely related to the appraisal of industrial property. These appraisal studies were made generally for acquisition, sale, financing, rate, condemnation and tax purposes, or to satisfy the requirements of local, state, and federal regulatory agencies.

During this 30-year period, I assisted with appraisal studies for some 170 industrial and government cli-

ents, more than half of which were public utility clients.

During this same period I either made or directed approximately 80 depreciation studies for some 46 public utility clients.

Q. Have you prepared a list of the public utility clients for whom you have made depreciation studies?

A. Yes, I have.

MR. ALLEN: Mark this, please. (A booklet entitled, 'Ebasco Depreciation Studies Involving Statistical Methods Made for Public Utility Clients,' was thereupon marked Plaintiff's Exhibit ZZZ by the Reporter.)

Q. (By Mr. Allen, continuing) I hand you what has been marked for identification as Exhibit ZZZ. Will you identify it for us, please (handing Exhibit to the witness)?

A. Exhibit ZZZ is a table showing a list of the clients for which I have either been assisting or directing statistical studies covering the subject of depreciation, and these clients are public utility clients.

Q. Will you proceed with the statement of your qualifications?

A. In connection with these appraisal or depreciation studies, I participated in conferences, or hearings, as a consultant or expert witness, in proceedings before the following regulatory agencies: Idaho, Kansas, Massachusetts, Nevada, New Mexico, New Orleans—pardon me—North Carolina, Ohio, Pennsylvania, Rhode Island, Virginia, and Washington, State Public Utilities Commissions; the Federal Maritime Commission; the Federal Power Commission; the Department of Justice; and the Internal Revenue Service.

I have also appeared as a valuation witness before courts of law in the United States and Canada.

Q. Are you a registered professional engineer?

A. Yes, I am a registered professional engineer in the States of Louisiana, New York, Pennsylvania, Rhode Island, Virginia, and Washington.

I also hold a certificate of qualification issued by the National Bureau of Engineering Registration.

Q. What are your professional society affiliations?

A. I am a member of the American Society of Appraisers, the American Society of Civil Engineers, and the Depreciation Accounting Committee of the Edison Electric Institute.

Q. What is the Edison Electric Institute?

A. The Edison Electric Institute is a trade association participated in by some 200 electric public utilities throughout the United States.

Q. You mentioned a Depreciation Accounting Committee of the Edison Electric Institute of which you are a member. Will you tell us what that committee is?

A. The Depreciation Accounting Committee of the Edison Electric Institute is a committee, a technical committee composed of engineers and accountants from various electric utility companies throughout the United States, with guest members from Canada, and also with representation from the various service companies, such as Ebasco and other companies.

Q. As a member of the Depreciation Accounting Committee of Edison Electric Institute, have you participated in any joint activity with any branch of the American Gas Association?

A. Yes. During the period from 1949 to the present, I have participated in the joint meetings of the Edison Electric Institute—the Depreciation Accounting Committee Meetings of the Edison Electric Institute and the American Gas Association.

Q. What is the American Gas Association?

A. The American Gas Association, like the Edison Electric Institute, is a

trade association composed of operating companies representing the gas transmission, gas production, and gas distribution. It also includes companies such as Consumers, where they serve both electric and gas.

Q. Are you generally familiar with electric and gas utility plants?

A. Yes, I am.

Q. Are you generally familiar with electric and gas utility rights-of-way?

A. Yes, I am.

Q. Have you made yourself familiar with Consumers Power Company, and particularly its plant and its operation?

A. I have.

Q. Mr. Reilly, two of the accounts in issue in this case involve average useful service lives of an account called electric transmission easements, and another one called electric transmission line clearing costs. Are you familiar with that?

A. Yes, I am.

Q. At our request have you made a determination of the average useful lives of the Plaintiff's property in these two accounts?

A. Yes, I have.

Q. Have you read the Stipulation of Facts and the supplemental Stipulation of Facts in this case?

A. Yes, I have.

Q. Have you examined the exhibits in this case pertinent to this issue?

A. Yes, I have.

Q. Have you listened to, or read the transcript of, the testimony in this case on the depreciation issue?

A. Yes, I have.

Q. Based on the testimony in this case and the facts as stipulated, do you have an opinion as to the average useful service life of plaintiff's electric transmission line clearing costs and the Plaintiff's electric transmission easements?

A. Yes, I have such an opinion."

With respect to the electric transmission easement account and the electric transmission line clearing costs account Mr. Reilly was asked what method he used in estimating the useful lives. He stated that he used the actuarial method. He further stated that: (Tr. 492–493)

"This method of analyzing past experience represents the application to industrial property of statistical procedures developed in the life insurance field for investigating human mortality.

It is distinguished from other methods of life estimation by the requirement that it is necessary to know the age of the property at the time of its retirement and the ages of survivors, or plant remaining in service.

The application of this method involves the statistical procedure known as the 'annual rate method' of analysis.

This procedure relates the retirements during each age interval to the exposures at the beginning of that interval, the ratio of these being the annual retirement ratio.

Subtracting each retirement ratio from unity yields a sequence of annual survival probabilities from which a survivor or mortality curve can be determined. The length of this curve depends primarily upon the years of experience available.

Normally, if the experience band of years is short in relation to the average life of the property, an incomplete or stub survivor curve results. While there are a number of acceptable methods of smoothing and extending this stub survivor curve, incomplete survivor curve, in order to compute the area under it from which the average life is determined, the well-known Iowa Type Curve Method was used in this study."

Mr. Reilly then proceeded to explain the statistical basis for the results he obtained. We will not set this forth here. It is of a technical nature and readily available by reference to transcript pages 493–497. When asked whether the actu-

arial method is the best method to use in estimating utility plant life, Mr. Reilly answered, "I would say it would be the preferred method to use where you have the information available." (Tr. 497–498) Mr. Reilly was asked if his estimate of average useful life was based to a great degree on plaintiff's past experience. He answered, "It is based primarily on Plaintiff's past experience, tempered with my own experience in other studies for other companies throughout the country." (Tr. 509) Regarding the issue of accuracy of estimation, the following question and answer occurred: (Tr. 514)

"Q. Mr. Reilly, in your opinion can the average useful service lives of the Plaintiff's electric transmission easements and electric transmission line clearing costs be estimated with reasonable accuracy?

A. Yes, I believe they can."

We will digress here for a moment to quote from the transcript of Mr. Reilly's testimony a few excerpts concerning "tangible versus intangible." (Tr. 520–522)

"Q. Assuming, Mr. Reilly, that for some reason it is decided that these two accounts in question are to be considered as intangible rather than tangible. Would this possibility affect your opinion with respect to the average useful lives of these two accounts?

A. No, because the fact of whether they are tangible or intangible is a matter of semantics. The fact remains that the company has experience retirements, substantial retirements in these two accounts.

Q. Now, the Defendant makes the point that the only cause for retirement of easements and clearing costs is obsolescence, while other types of plant may be retired because of wear and tear as well as obsolescence. Does this possible distinction have any ef-fect on your conclusion as to the average useful lives of these two accounts?

\* \* \* \* \* \*

A. No, this distinction does not have an effect on my opinion, because the basic causes of retirement of public utility plant are for reasons of, primarily, functional causes of depreciation.

By such functional causes I mean inadequacy, obsolescence, requirements of public authorities, and such reasons as that, rather than pure physical wear and tear.

And even in the case of transmission lines where there is a retirement for wear and tear, the main retirements that take place are the ones that are caused by obsolescence, where sections of land are abandoned completely, and the transmission clearing and right-of-way no longer becomes useful, and there is no other thing to do but to retire it."

Let the above put to rest forever (as far as this opinion is concerned) this no-account issue.

Mr. Reilly testified as to retirement of electric distribution lines. His testimony on this issue was as follows (Tr. 523):

"However, the same reasons, the same causes for retirements that result in the retirement of a transmission line—and sometimes to a greater extent—also exist in the retirement of a distribution line. And where the line goes, the easement is no longer useful.

Mr. Kluberg—Mr. Youngdahl has covered that point to a great extent, and he mentioned the reasons why these transmission lines, or these distribution easements should be depreciated, and I agree with him. I have studied the reasons that he has given.

Now, I would think that, in view of this situation, that a reasonable serv-

ice life for distribution easements would be the 50 years established by the Michigan Public Service Commission in their recent Rate Order—in their recent Depreciation Order, I mean."

As for the gas distribution easements, Mr. Reilly testified that a reasonable basis for the average useful life would be the "life of the main." (Tr. 525) Mr. Reilly's testimony on cross-examination bears repeating here (Tr. 547–552):

"Q. (By Mr. Anderson, continuing) Did you state that your opinion as to a useful life of the electric distribution easements was based primarily on the life which had been accepted by the Michigan Public Service Commission?

A. In lieu of any better information, I made such a judgment.

Q. And do you know the basis on which the Michigan Public Service commission determined the useful life is accepted?

A. Yes, it was based primarily on the life expectancy of the line upon which these easements were located.

Q. Do you adopt that basis which was used by the Michigan Public Service Commission as your own, then?

A. No, I don't adopt that basis as my own. I explained that in setting a qualified—in giving a qualified opinion as to an average life, reasonable life expectancy, I had selected the 50-year life that the Michigan Public Service Commission ordered the company to depreciate its easements on as a reasonable basis for making such depreciation accrual.

Q. But do I understand you to say that you reached the same conclusion as the Michigan Public Service Commission, but not for the same reason?

A. Well, in my opinion, based on my experience in other locations in other companies having similar type of property, 50 years is a reasonable life to use for depreciating easements.

Q. I will repeat my question. Did you reach the same life as the Michigan Public Service Commission, but not for the reason that the Michigan Public Service Commission did?

A. I considered the reasons that the Michigan Public Service Commission used in reaching my decision.

Q. What weight did the reasons of the Michigan Public Service Commission bear in your decision as to the useful life?

A. I didn't use any hypothetical scale, but I looked at the end result of their Order in this particular case and I found it to be reasonable in my judgment.

Q. Were you substantially influenced in your judgment as to the useful life of the electric distribution easements by the reasons which the Michigan Public Service Commission used in determining the reasonable life that they approved?

A. Yes. To the extent that I correlated the life of the distribution easement to the life, the expected life, of the distribution lines of such easements.

Q. Was that correlation a substantial basis for your opinion?

A. It was the only basis that I had.

THE COURT: Do you mean the Michigan Public Service Commission—

A. (Interposing) Plus the reasons that—

THE COURT: (Interposing) You have enumerated.

A. (Continuing)—were enumerated, and which Mr. Youngdahl enumerated and which he discussed in detail.

THE COURT: If you did not have the benefit of the—what was it? 50 years?

A. Yes.

THE COURT: (Continuing)—that has been prescribed by the Michigan Public Service Commission, would your qualified opinion be the same?

A. It would be the same, yes. 50 years is reasonable. It is an estimate that is used by other utilities for that particular type of asset, in my opinion.

Q. (By Mr. Anderson, continuing) Is that estimate used by other utilities, to your knowledge, based on the experience of the other utilities?

A. It would be based on their experience to a degree, but on judgment primarily.

Q. Is it conceivable that their experience in this regard might differ from that of the plaintiff?

A. It is conceivable.

Q. Does it happen with some frequency that the experience of one company with a given type of asset differs from the experience of another company with the same type of asset?

A. It could happen.

Q. Does it happen?

A. It happens from time to time.

Q. You have said that you are satisfied on the evidence that there will be retirements of distribution easements in the future?

A. That is correct.

Q. And that a reasonable service life for those easements would be 50 years?

A. That is correct.

Q. Can you again state how you came up with that figure of 50? Not that there will be retirements, but that they will occur on such an average that 50 years is a proper service life to be used?

A. I think I have covered that subject quite extensively. That is, in my opinion, 50 years.

Q. Is the figure '50' the result of—does it bear any relationship to the average service life of the poles and the conductor installed on those easements? Is your basis of the figure '50' related to the service life of the poles and conductor installed on those easements?

A. Yes, it is related to the extent that, in my opinion, the life of the easement will exceed the life of the lines on the easements, generally speaking.

Q. 'Will,' I said. How do you determine by how much it will exceed the life of the poles and conductor?

A. This is a judgment figure based upon my experience in other places in just how much differential there is between the life of the easement and the life of the pole, or the pole line.

Q. Based on how much differential there is between the life of the easement and the life of the pole line? Pole and line?

A. That is correct.

Q. Is not what we are attempting to determine the life of the easement?

A. That is the figure that I have given you.

Q. In fact, have you not reached the figure 50 years by increasing by a percentage the known or accepted life of the poles and conductors installed on the easements?

A. I haven't done that. The Michigan Public Service Commission may have, but I didn't.

Q. With respect to the gas distribution easements, did you testify that the experience indicates a relatively short life for the supply lines, the urban supply lines?

A. Past experience indicated such life.

Q. Now, what experience did you have reference to in that statement?

A. The experience as indicated by the retirements in Exhibit—may I have that?

Q. I am sorry. Is it this one, Mr. Reilly? (Handing document to the witness.) Exhibit—

A. That is correct. That is Exhibit EEE.

Q. And did you testify that in your judgment the life—strike that.

What is your opinion as to the relationship between the life of the gas

distribution easement and the life of the gas main itself?

A. My opinion is that there is a direct relationship.

Q. Yes. What is the relationship?

A. A direct relationship.

Q. Yes. And what does it consist of?

A. That there would be the same—a reasonable basis for depreciation of the gas easements with the life that had been developed for the gas mains themselves."

Mr. Daniel C. Sherman testified as a witness for plaintiff. We set forth here his qualifications and background as they were developed at the trial: (Tr. 617–621)

"Q. Your full name, please?

A. Daniel C. Sherman.

Q. Mr. Sherman, what is your occupation, please?

A. I am a consulting engineer.

Q. With whom are you associated?

A. Jensen, Bowen & Farrell, Engineers, Ann Arbor.

Q. What is the general area in which Jensen, Bowen & Farrell does most of its work?

A. We do most of our work for utilities in appraisals and valuation and depreciation studies.

Q. What type of utilities, Mr. Sherman?

A. Electric, gas, steam heat, and railway.

Q. Water?

A. Yes, we have done water, too.

Q. Telephone?

A. Yes.

Q. Mr. Sherman, have you prepared a résumé of your educational and professional experience?

A. Yes, I have.

MR. ALLEN: Mark this, please.

(A booklet entitled 'Qualifications of Daniel C. Sherman, Partner in the Firm of Jensen, Bowen & Farrell, Engineers, Ann Arbor, Michigan' was thereupon marked Plaintiff's Exhibit BBBB by the Reporter.)

Q. (By Mr. Allen continuing) Mr. Sherman, I hand you what has been marked Exhibit BBBB for identification. Will you identify it for us, please? (Handing exhibit to the witness.)

A. Yes. This is the record of my qualifications and experience.

Q. I have been advised we don't have your residence address in the record, Mr. Sherman. Would you give us that please?

A. Yes. 1505 Linwood Avenue, Ann Arbor, Michigan.

Q. So that the Court will have a general idea of your qualifications, will you summarize your education?

A. I am a graduate of the Michigan College of Mines, with a Bachelor of Science and Engineer of Mining degree. I have taken a home study course in Gas Engineering—

Q. (Interposing) Are you a registered professional engineer?

A. Yes, I am a registered professional engineer in the states of Michigan and Ohio.

Q. How long have you been associated with Jensen, Bowen & Farrell?

A. Since 1931.

Q. How long have you been a partner in the firm?

A. Since 1947.

Q. Very briefly, what sort of engineering work did you do prior to coming with Jensen, Bowen & Farrell in 1931?

A. I worked as a mining engineer when I first got out of school, and I worked for the Detroit City Gas Company in the design and construction of gas plants.

Q. Subsequent to 1931, what sort of work have you done with Jensen, Bowen & Farrell?

A. Prior to 1931—subsequent to 1931?

Q. Subsequent to 1931.

A. I worked on appraisals and depreciation studies for four railroads and 12 utilities.

Q. Can you name some of the utilities for which you or your firm performed engineering services over the past few years?

A. Cleveland Electric Illuiminating Company, Consumers Power Company, Detroit Edison Company, Michigan Consolidated Gas Company, Michigan Gas & Electric, Michigan Gas Utilities.

Q. Did any of this consulting work involve the determination of depreciation rates for utility plant?

A. Yes, it was a considerable part of our work.

Q. Have you ever been called upon to testify in judicial or administrative proceedings?

A. Yes, I have.

Q. In what courts or regulatory commissions?

A. I have testified before the regulatory commissions of Michigan, Ohio, and New Jersey, and in courts in Canada and the United States, Michigan.

Q. Of what professional associations are you a member, Mr. Sherman?

A. American Society of Civil Engineers; American Society of Appraisers; Michigan and National Societies of Professional Engineers; Michigan Association of the Professions; and the Tau Beta Pi Honorary Engineering Society.

I was an individual member of the American Gas Association, and a guest member on the Committee of Depreciation Accounting Committee of A.G.A.

Q. The 'A.G.A' is the American—

A. (Interposing) American Gas Association.

Q. Thank you.

Have you heard the direct testimony of Mr. Reilly in this case?

A. Yes, I have.

Q. Do you concur in his description of the actuarial method of life determination?

A. Yes, I do.

Q. Do you agree with Mr. Reilly that the actuarial method is the most accurate way of determining the useful life of public utility plants?

A. Yes, it is, if you have the available records of aged retirement.

Q. In your experience has such data always been available?

A. No, it is not always available.

Q. Are you generally familiar with electric and gas utility plants?

A. Yes, I am.

Q. Are you generally familiar with electric and gas utility rights-of-way?

A. Yes. Generally.

Q. Are you familiar with Consumers Power Company and, in particular, its plant and its operation?

A. Yes, I am. I have been doing work for Consumers Power Company on their property since 1947.

Q. Have you ever looked at the physical property of Consumers Power Company?

A. Yes. We have gone over their property many times.

Q. About what portion of the plant of Consumers have you actually seen?

A. Well, I have gone over their complete territory numerous times. I have seen all their location property and a great deal of their distribution and transmission system.

The only plant I haven't been into is the Big Rock Atomic Energy Plant.

Q. You have not been inside it?

A. No, I haven't been inside of that."

Mr. Sherman testified that he authored a booklet entitled "Consumers Power Company, Determination of Average Service Lives for Electric Transmission Land Rights—Easements; Electric Transmission Land Rights—Clearing. Tax Base." which was marked Exhibit

CCCC (Tr. 622). He identified it as an "exhibit that I prepared showing a study of useful lives of electric transmission land rights—easements, and electric transmission land rights—clearing. It is a tax base dollar." (Tr. 623) Mr. Sherman was asked to explain how he went about determining the useful life of plaintiff's electric transmission easements. He proceeded to give a full explanation, which we will not set forth here. His conclusion was that the useful service life of plaintiff's electric transmission easements is 63 years. (Tr. 628). His testimony as to the average useful life of the electric transmission clearing costs was that "the useful life is 70 years." (Tr. 628). Concerning the method used by Mr. Reilly compared to the method used by Mr. Sherman, the following colloquy between counsel and Mr. Sherman took place: (Tr. 629–630)

"Q. (By Mr. Allen, continuing) Now, Mr. Sherman, you have indicated that you and Mr. Reilly both have used the actuarial method of estimating the utility plant life in this case; is that correct?

A. That is correct.

Q. And your method differs slightly from Mr. Reilly's?

A. The method of fitting the Iowa curve differs slightly, yes.

Q. Is it basically the same method, however?

A. Yes, basically they are the same method.

Q. Does this slight difference in application explain why you arrived at an average useful service life of 63 years and Mr. Reilly arrived at an average useful service life of 70 years with respect to Plaintiff's electric transmission easements?

A. Yes. A different application of the method of fitting is what results in the difference in lives.

Q. Should both your technique and Mr. Reilly's with respect to the actuarial method be expected to yield similar results on the basis of similar facts?

A. Yes, they are.

Q. Are both your technique and Mr. Reilly's recognized by the Depreciation Accounting Committee of the Edison Electric Institute?

A. Yes, both methods are.

Q. In Michigan, Mr. Sherman, how often do utilities review their depreciation practices?

A. All the utilities in Michigan are on the five-year review, as far as my knowledge is now.

Q. This is by order of the Public Service Commission?

A. Yes. It is usually written in the Order that they get for their rate, that a review shall be made within a five-year period.

Q. In your opinion, Mr. Sherman, can the average useful service lives of Plaintiff's electric transmission easements and electric transmission line clearing costs be estimated with reasonable accuracy?

A. Yes, in my opinion I believe they can be."

Next, Mr. Sherman was asked about the average useful life of electric distribution easements. He agreed with Mr. Reilly that 50 years is the average useful life of the electric distribution easements. Mr. Sherman also testified as to his opinion of the average useful service life of the gas distribution easements—that it is 43 years, "the same as the mains." (Tr. 632).

The only witness called by the government was Mr. George V. Robinson, whose testimony on direct comprises pages 633–679I of the transcript. We set forth here pages 663–679E:

"Q. Will you state your name, please?

A. George V. Robinson.

Q. Will you state your address, Mr. Robinson?

A. I reside at 195 Glenwood Avenue, Daly City, California, a suburb of San Francisco.

Q. And what is your present business or occupation?

A. I am a retired civil engineer.

Q. Will you tell the Court what your professional education was?

A. After five years of an engineering course, I received a Bachelor of Science degree in Civil Engineering at Oregon State University in 1919.

Q. Was the course normally a five-year course?

A. No.

Q. Or was it a four-year course that took you five years to complete?

A. I specialized in Civil and Hydraulic Engineering. My course was interrupted also by other circumstances. I stayed out one year and worked, and lost some time due to that.

Q. Will you tell the Court of your membership in any professional societies?

A. I am a member of the American Society of Civil Engineers and of the National Society of Professional Engineers.

I am a registered professional engineer, registered in 1922 in the State of Oregon.

Q. Beginning with your graduation from college will you state to the Court what your professional employment has been?

A. Upon graduation in 1919, my first employment was with the Oregon State Highway Commission. I worked there for two and a half years. At that time I had previously been employed by the Commission.

During that time I became a resident engineer and had charge of eight residences in grading and surfacing of state highways in the State of Oregon.

Q. Following your employment by the Oregon State Highway Commission?

A. Following that, in the Fall of 1921, I joined the staff of Baar & Cunningham, Consulting Engineers, of Portland, Oregon.

I continued in that service as an employee or an associate for some 18 years, and during that time participated in most of the many projects that passed through that office.

My duties included studies, investigations, designs, estimates, reports, plans, specifications, and supervision of construction as Resident Engineer, as Superintendent of Construction, or in general supervision from the main office; upon industrial and municipal water supply projects, irrigation and drainage projects, sanitation, electric power and other public utility projects, including dams, canals, flumes, pipelines, tunnels, hydraulic structures, filtration plants, sewers, sewage treatment plants, pumping plants, and general municipal work.

I was personally connected with design and/or construction of 12 dams, two small hydroelectric generating stations, and five hundred and sixty miles of R.E.A. electric transmission and distribution lines.

I made several appraisals of public utility water plants for purchase or for condemnation.

I made studies, investigations, and reports in water right cases—domestic, industrial, irrigation, and power; and testified in hearings, adjudications, and litigations.

And during this period, on five separate occasions was employed independently by the Oregon Public Service Commission, now called the Public Utilities Commission, upon investigation, studies, appraisals, and testimony incidental to electric utility and telephone rate cases.

Q. Your employment at Baar & Cunningham was during the period 1921 to 1939?

A. That is correct.

Q. Did your employment change in 1939?

A. It did.

Q. And will you tell the Court what the circumstances of that change were?

A. In 1939, unsolicited, I received an offer from the Treasury Department, the Engineering Section of the Internal Revenue Service, for work on a specific job. It had to do with the value of some water rights and power rights.

I spent—I went to Washington from Portland to talk about the employment, and accepted that employment in 1939.

Q. And did you remain in the employment of the Internal Revenue Service down to your time of retirement?

A. I did.

Q. And your retirement was in what year?

A. 1964.

Q. Will you describe the duties and the nature of the work which you performed during the period of your employment by the Internal Revenue Service from 1939 to 1964?

A. Well, all of that work was related—all of my duties were related to federal income tax.

I progressed through the various stages of Civil Service from Valuation Engineer, as I started, up through Supervising Valuation Engineer, and for several years at the time of my—prior to the time of my retirement had been head of the Engineering Section in the San Francisco district.

As Valuation Engineer I made investigations, studies; I prepared reports covering engineering issues in tax cases of public utilities and railroads as a specialty, and also in tax cases involving industries, valuations, water rights, power rights, securities, and intangibles.

Over the years I have handled hundreds of assignments, including assignments in tax matters pertaining to most of the large electric utilities in the West.

As Supervising Valuation Engineer, I supervised the San Francisco engineering staff, each man a specialist in his field of mining, petroleum, timber resources, railroads, public utilities, general industry, or real estate. I assigned cases, supervised the work, reviewed all reports, and handled conference work and court work as necessary.

Q. Included in that work did you make depreciation studies?

A. Oh, yes. Many of them.

Q. Of what types of business, Mr. Robinson?

A. Industries; railroads; and electric and gas utilities primarily.

Q. Have you previously testified in court or before administrative bodies?

A. I have.

Q. And what, generally, was the nature of those proceedings?

A. Well, I have been in court on condemnation work and in hearings prior to my employment with the Revenue Service.

In the Revenue Service, the court appearances were incidental to the cases that I had been working on. Several of them had to do with electric utilities.

Q. And what aspect of the electric utilities? What aspect of their tax return?

A. Well, depreciation was involved in most every case, I think. However, there were usually some matters of retirement losses, as to whether or not they were allowable.

Q. Mr. Robinson, were you retained by the Department of Justice in connection with this litigation?

A. I was.

Q. And what was the purpose of your employment?

A. To evaluate the facts with respect to depreciation of the taxpayer's

electric transmission line clearing costs, and electric transmission, electric distribution, and gas distribution easement costs.

Q. Approximately when were you retained for that purpose?

A. September—past September, 1966.

Q. And are you being compensated for your services?

A. I am.

Q. Will you tell the Court, briefly, what you did in connection with your employment after you were employed in September 1966?

A. First I went to Washington from San Francisco for conferences. Then spent four days at Jackson looking over the property and certain parts of the property; and the records; and conference with employees of the Consumers Power Company, particularly Mr. Van Ess and a Mr. Gutekunst.

I also met the attorneys and other employees of the company.

Q. When you referred to 'looking over the property,' will you tell us what particular property you had reference to?

A. From the data that had been sent me, I picked a few rather large retirements of easements and—one of them, at least, included some clearing — transmission — these were transmission lines that had been abandoned in the past. They were selected because they were much larger abandonments than most that had been reported.

In addition in the office I had checked certain retirements at random or by location in various parts of the state to see what had happened to those retirements, or what caused them.

Q. At the end of the four days in Jackson, what did you next do?

A. I returned to Washington for further conference.

Q. And following those conferences? How long were you in Washington on that occasion, if you can remember?

A. All of the week following my week in Jackson I spent in Washington, in a series of conferences and in preparation of a report that I later submitted.

Q. Following the week in Washington, what did you do?

A. I returned to San Francisco, where I completed my report and sent it to the Department of Justice.

Q. Have you been in the courtroom during all of the testimony in this case so far?

A. I have.

Q. Have you examined the Stipulation of Facts and the various exhibits which relate to Plaintiff's claim for depreciation?

A. So far as they relate to my assignment. There are some exhibits that I have not examined.

Q. Well, have you examined all of them that have to do with the claim for depreciation?

A. I have.

Q. As a result of your independent study, the information contained in the exhibits, and the testimony of Plaintiff's witnesses here in court, do you have an opinion as to whether an average service life of Plaintiff's electric transmission line easements can be determined?

A. I have.

Q. What is your opinion?

A. An average service life study of Account 350, which is transmission right-of-way easements, based upon the unadjusted retirement data furnished, does tell us what happened in the past 60-odd years to about two percent of all additions during that period, but does not necessarily indicate any average life for the 98 percent surviving.

The data furnished in Exhibits WW and XX tabulate additions and re-

tirements and balances by years from 1902 to 1964, and identify retirements to year of origin.

The retirement data furnished includes all retirements of whatever nature during the 63-year period of history, and some of these retirements came about due to circumstances indicating special obsolescence, and basic addition and retirement data should always be averaged for all abnormal retirements before using it in average life studies.

Other things to be recognized in use of the basic data area are:

That retirement data is erratic. During 28 of the 63 years of record, no retirements are recorded, and 80 percent of the account came into being during the last 20 years of the history.

Total retirements prior to 1962, when the final classification adjustment appears, amounted to about 2.08 percent of additions of some six million dollars up to that date.

And at no place in the data furnished are normal and abnormal retirements segregated. Only normal retirements should be included in average life studies.

During 17 of the years of record, easements were retired during the years of origin. These items appear not to have been used, and, if so, should not be included in data for average life studies.

To include such, overstates both additions and retirements without affecting balances.

Now, by way of example of special obsolescence inclusions, Plaintiff's witness Reid mentioned three examples of typical transmission easement retirements.

I had examined two in the field and a third in the taxpayer's office, so I was familiar with them.

The first mentioned was the abandonment of about eight miles of steel tower transmission line from Riga southeasterly to the state line. The location was across farm land and included some 51 easements with total cost of $35,494. The line was built in 1927 and removed in 1950 at age 23 years. The retirement was due to replacement by another line in another location and not related in any way to time or to deterioration of the assets.

This was a case of special obsolescence, and, therefore, an abnormal retirement. It was not the kind of retirement that could be anticipated in a useful average life study. Its basis, $35,494, should, therefore, be removed from both additions and retirements in any average life studies.

I made a calculation just to show how that would affect an average life, and by removal of the $35,494 from additions in 1927 and from retirements in 1950, the accumulated balances are reduced by some $816,000, and by a geometric mean calculation the average life expectancy was increased—using the band '46 to

'64—was increased from 72 years to 77 years.

Plaintiff's Exhibit MMM tabulates numerous reasons for vacating or abandoning electric transmission and distribution right-of-way easements. Practially all of these reasons relate to specific circumstances in no way related to age, or time, or deterioration, or ordinary obsolescence that would be recognized in estimating normal useful life for a multiple asset account.

Most of the reasons tabulated would indicate special obsolescence. Special obsolescence should be eliminated from data before study for useful life purposes.

Now, from the data furnished, we can determine that during the more than 60 years of record prior to 1962, easement retirements amounted to about 2 percent of additions to that date. We can determine the dollar

age of the retirements and the dollar age of the 98 percent surviving, but we do not know to just what extent the past retirements qualify as normal retirements that can be included in the basic data for use in average life study of the account.

An examination of the Plantiff's Exhibit MMM clearly indicates that for the retirements as listed, almost without exception it indicates special obsolescence and that those retirements will have little, if any, relation to age or time or use, or to deterioration of the assets to be retired.

Q. Is it, then, your opinion for the reasons just stated, Mr. Robinson, that no useful service life can be determined for the electric transmission line easements?

A. Not from the data as submitted. It must be adjusted.

Q. In stating your reasons you referred to 'normal' and 'abnormal' retirements. Would you explain to the Court what you mean when you say a normal retirement and what you mean when you say an abnormal retirement?

A. A normal retirement is one that might be predicted at the time the property is installed. An abnormal retirement is something that comes about due to circumstances that could not be anticipated. Usually rather sudden.

THE COURT: What would those circumstances be? Give an illustration of a circumstance.

A. The example I used, your Honor, of a circumstance was the building of a new transmission line in another location that made the—brought about the need for retirement of the Riga transmission line.

THE COURT: Wasn't there a reason for the move, the change?

A. Oh, no doubt.

THE COURT: Well, could it be a reason that could be anticipated? What is the reason?

A. The reason probably was growth.

THE COURT: Growth of the community?

A. Growth of load and community and requirements.

THE COURT: Can't that be anticipated?

A. To some extent. That would be included in—normal obsolescence is obsolescence that can be anticipated with reasonable accuracy, at least the same accuracy that you can anticipate in rate determination, in life determination other than obsolescence, and is included in the rate of depreciation.

Special obsolescence is usually sudden and would not be anticipated long in advance of the retirement, and usually retires an object long before its usefulness has been used up. And retirement losses such as that are allowable.

Q. (By Mr. Anderson, continuing) At what time are such retirement losses allowable?

A. At the time of retirement.

Q. As a result of your independent study, the information contained in the exhibits, and the testimony you have heard in court, do you have an opinion as to whether an average service life of Plaintiff's electric transmission line clearing costs can be determined?

A. Yes, I have.

Q. What is your opinion?

A. Much the same as in Account 350, a useful life for electric transmission clearing, Account 351, cannot be determined from the data as furnished unadjusted for more or less the same reasons I mentioned in connection

with Account 350, Transmission Right-of-Way Easements.

The data furnished in Exhibit NN tabulates additions, balances, and retirements by years from 1904 to 1964, and retirements are identified to year of origin in Exhibit OO.

The addition and retirement data is rather erratic.

90 percent of the investment originated since 1945, and during 26 of the 61 years of record there were no retirements.

Total retirements during 61 years have amounted to but $100,100, or 1.8 percent of additions that total five and one-half million dollars.

I am not able, from the data, to determine which retirements are abnormal due to relationship to special circumstances that brought about retirements and which are normal and qualify for use in average life study.

Further, the electric transmission right-of-way clearing costs are non-recurring costs; and the clearing, once completed, does not deteriorate with time or use. The cost of the original right-of-way clearing is capitalized in Account 351, a primary property account. The right-of-way is kept in its originally cleared condition through maintenance, which cost is charged to Account 571, an operating account.

Right-of-way clearing suffers no decline in usefulness or in value so long as the right-of-way is used.

Q. Is it, then, your opinion, Mr. Robinson, for the reasons you have just stated, that no average service life can be determined for Plaintiff's electric transmission line clearing costs?

A. From the data as submitted, that is true.

Q. As a result of your study and the information contained in the exhibits, and the testimony you heard in court, do you have an opinion as to whether the average service life of Plaintiff's electric distribution line easements can be determined?

A. Yes, I have.

Q. And would you state to the Court what your opinion is and the reasons for it?

A. In the case of Account 360, Electric Distribution Easements, the data furnished is not sufficient to indicate useful life.

Plaintiff's Exhibit YY shows additions and balances, but no retirements. Although the schedule, Exhibit YY, would indicate that additions are net, during my field examination it was developed that additions listed gross additions. Balances shown are but a summation of the additions, so are overstated by the amounts of unrecorded retirements.

No life computation can be made from this data, because we do not know what retirements may have been made or when.

Q. Based on your independent study, the exhibits, and the testimony which you have heard here in court, do you have an opinion as to whether an average service life of Plaintiff's gas distribution easements can be determined?

A. I have.

Q. And would you state to the Court what your opinion is and the reasons for your opinion?

A. I was supplied with Exhibits EEE and GGG. These are schedules showing additions, retirements, and balances in the gas distribution system for the years 1922 to 1964, and also the retirements identified by year of origin.

This basic data shows that 52 items with a total cost of $70,089 were re-

tired during 14 years, and that no retirements were made during the remaining 29 years of the 43 years of record.

Of these retirements, 25 items totaling $68,914 in basis represent 434 easements retired in 1951, 1952, and 1953, of what would, under prescribed accounting for gas utilities, be classified in accounts under natural gas production plant and gas transmission plant, not gas distribution plant.

The remaining $1,179 of basis retired is in 27 small items retired during eleven separate years, and is all of the retirement that can be considered in any average life study of the account.

The retirement history of $1,179 during a 43-year period from an amount of $889,000 cannot be considered to indicate any average life for the account.

These retirements, under prescribed accounting, should be charged to account 325, Right-of-Way Easements—Gathering Lines; 232, Right-of-Way Easements—Field Lines; and under natural gas transmission plant, Account 365, Transmission Right-of-Way Easements.

Q. Excuse me, Mr. Robinson. What retirements are you referring to when you said 'these retirements?'

A. The retirements of 35,000—I beg your pardon—of $68,914 out of a total retirement of 70,000-odd reported.

They relate to transmission line, not to distribution.

These production and transmission lines, with a total cost of $68,914, were abandoned at the average age of 15 years.

Upon inquiry of Mr. Van Ess and Mr. Gutekunst relative to the circumstances of the abandonment, I was informed that the abandonment was because of depletion of the gas fields served northwest of Lansing.

Not only is the classification of cost questionable under prescribed accounting, but the circumstances of the retirement was such that it was not a normal retirement such as could be included in an average life study.

Because this abandonment was an abnormal retirement, an abandonment loss would have been allowable in lieu of depreciation, under retirement accounting.

Q. Is it, then, your opinion that no average service life can be determined for the gas distribution easements on the data furnished, for the reasons which you just stated?

A. Yes, it is.

Q. Based on your study, the exhibits, the testimony of the witnesses here in court, do you have an opinion as to whether an average service life of Plaintiff's electric distribution easements can be determined on the basis of the known retirements of Plaintiff's electric transmission line easements?

A. Yes, I have.

Q. Would you state to the Court what your opinion is and the reasons for your opinion?

A. We have no actual comparative data; and, as described by the taxpayer's witnesses, the transmission and distribution systems are quite different, and there is no reason to believe that the average life of an electric distribution easement is in any way related to the useful life of a transmission easement.

Q. Based on your study, the exhibits, and the testimony, do you have an opinion as to whether an average

service life of Plaintiff's electric distribution easements can be determined on the basis of the average service life of the poles and conductors installed on the distribution easements which has been accepted for federal income tax purposes?

A. I have given this some thought. The easements are in perpetuity, as shown in Plaintiff's Exhibit VV, and the testimony is that the poles and conductors are replaced as necessary without abandoning the easement.

Poles and conductors are both open end depreciable accounts with additions and retirements occurring yearly, and the accounts and the power line continue by replacements perhaps through several average lives or life cycles.

The underlying right-of-way easement will be 100 percent useful as long as the power line exists. Unlike the poles and conductor, which deteriorate with time and must be replaced from time to time, the underlying ground easement does not deteriorate with time and may never have replacements, but continues in full service and usefulness as long as the power line exists, and may well be in full service after several life cycles of the depreciable assets.

Q. What is the depreciable asset to which you refer there? The poles and conductors?

A. That is right. The poles and conductors.

Q. Based on your study, the exhibits and the testimony, do you have an opinion as to whether an average service life of Plaintiff's gas distribution easements can be determined on the basis of the average service life of Plaintiff's gas mains which has been accepted for federal income tax purposes?

A. Yes, I have.

Q. State to the Court what your opinion is and your reasons for it?

A. We do not know the life experience in the distribution system. We do not know the average life of the rural distribution system as compared with the urban grid. The only life suggested, 43 years, is a composite of both.

\*    \*    \*    \*    \*    \*

Q. (By Mr. Anderson, continuing) When you said 'the only life suggested is a composite of both,' to what assets were you referring, Mr. Robinson?

A. Gas distribution system.

Q. Of the easements or the mains?

A. That is a composite—43 years is a composite life of the gas mains as shown on—maybe this isn't an exhibit; I don't have it marked as such—'Life of Gas Distribution Mains,' the schedule that was handed to me.

Q. It is an exhibit, Mr. Robinson. Just a moment and I will give you the number. Are you referring to a document which was marked Exhibit XXX as part of a paragraph 104 of the Supplemental Stipulation which was filed yesterday? Is that the document? (Handing document to the witness.)

A. That is the schedule to which I am referring.

Q. So that it is your opinion that no service life for the gas distribution easements can be determined on the basis of the average service life of the Plaintiff's gas mains?

A. We don't have—the answer to that question would be 'No.' I would like to qualify it.

We don't have enough information from which we could determine a service life of the rural system, and the testimony has been that these easements are rural.

We don't have a breakdown of the type of pipe, or the quantities, that

are in either the rural or the urban grid."

The post-trial arguments of counsel consisted of resubmission by them of their respective positions concerning the reliability of the prediction "with reasonable accuracy" of the useful lives of the assets in question. Each drew upon the testimony adduced from the witnesses who testified on this issue. There is nothing to be gained here by further reference to these arguments, other than to add to the length of this already long opinion. Subsequent to the post-trial argument there has been a decision by the Court of Appeals for the Fourth Circuit which, in our opinion, embodies the reasoning and viewpoints of the decided cases cited to this Court by the parties. That case is close to the instant case on the facts, and the rationale there employed parallels our thinking and conclusion here so closely that we adopt it herewith. The variations between that case and this are of so little significance in relation to the fundamentals as to be superficial. True, the plaintiff there was engaged in distribution of natural gas, while the plaintiff here distributes both natural gas and electrical energy. In that case, Commonwealth Natural Gas Corp. v. United States, 395 F.2d 493 (C.A.4, 1968), the testimony of one witness, Doctor Bruce C. Netschert was sufficient to convince the trial court and the appeal court of the validity and soundness of plaintiff's position. The Court stated as follows, at page 497:

"Dr. Netschert was established to be a man of extensive and impressive qualifications in the study and assessment of present and future supplies of energy in the United States, including oil and natural gas. *The government presented no evidence to controvert that adduced from Dr. Netschert.* While it does not attack his credibility as such, it relies solely on the answers elicited from him on cross-examination and what it considers the general unpersuasiveness of his testimony."

In the instant case the government did present evidence (the testimony of Mr. Robinson) to controvert that adduced from plaintiff's witnesses Youngdahl, Simpson, Reilly and Sherman, who were established without question to be men of extensive and impressive qualifications as to the subjects about which they testified. After listening to all the testimony originally, reviewing it subsequently, and studying the decided cases and the briefs submitted by counsel for the respective parties, this Court is persuaded that plaintiff has satisfied, by proof, the test for determining useful life with reasonable accuracy, and that it is entitled to the depreciation deductions for the four plant asset accounts in accordance with the consensus of its witnesses.

Appropriate judgment(s) may be presented in accordance with this opinion on the issues of advertising, death benefit, and depreciation. Counsel may also submit proposed supplemental findings of fact and conclusions of law for consideration by the Court.

**1214**

1. *Those were the days* — when mama was wary of newfangled gadgets — and papa raged about everything including the "light bill." In today's "electric age," the average family uses a dozen different electric appliances for everything from housework to entertainment.

2. *The more the merrier!* A look at your electric bill will show that you're getting a lot *more* electricity for your money nowadays. The price per kilowatt-hour has gone down and down for the average U. S. family. It's even lower than it was before World War II!

3. *You think this is big* — you ought to see the way the electric industry has grown. Electric light and power companies have *tripled* their supply of electricity in 15 years! To keep ahead of the nation's needs, they'll add half again as much by 1960!

4. *Don't look now, but—!* Although most Americans aren't aware of it, some people have talked the federal government into the electric power business in a big way — $6 billion worth — at the taxpayers' expense. And they're still pressing to have the government spend more.

5. *Somebody do something!* Here's something <u>you</u> can do. Look *twice* at any plan for a new federal power project First, see if it is really necessary. Second, see if it is a job electric companies could do better— and at their own expense.

6. *How can he resist?* With your help, Congress can—and will—resist those who want a federal monopoly of electricity. You don't want extravagance. And you don't want the threat of socialism. Let your congressman know what *you* think.

### America's Electric Light and Power Companies*

*Names on request from this magazine

Watch for "YOU ARE THERE"—on CBS television—witness history's great events

Colliers' . . . . . . . . . . . . . . . . . . . . . February 19, 1954
Saturday Evening Post . . . . . . . . . . . . February 27, 1954
American . . . . . . . . . . . . . . . . . . . . . March, 1954
American Press . . . . . . . . . . . . . . . . . . March, 1954
Successful Farming . . . . . . . . . . . . . . . March, 1954
Editor & Publisher . . . . . . . . . . . . . . . March 6, 1954

U. S. News & World Report . . . . . . . . March 12, 1954
Publisher's Auxiliary . . . . . . . . . . . . . March 13, 1954
Broadcasting - Telecasting . . . . . . . . March 15, 1954
Look . . . . . . . . . . . . . . . . . . . . . . . March 23, 1954
Capper's Farmer . . . . . . . . . . . . . . . . April, 1954
Farm Journal . . . . . . . . . . . . . . . . . . April, 1954

Progressive Farmer . . . . . . . . . . . . . . . . . April, 1954

*Disallowed*

# How much would you contribute
## for a socialistic U.S.A. ?

Not a nickel, you'd say.

But you are helping to pay for one more steppingstone toward a socialistic America every time the federal government builds an electric power plant that business stands ready to build.

There are persuasive groups of people who want to push government farther and farther into the electric business. They are encouraging government to keep on building new power plants—with your tax dollars.

All that spending of tax money by government is not necessary.

For there is a better way to produce electricity's benefits for Americans.

It's simply the way the hundreds of electric light and power companies, with money from millions of investors, have built the greatest electric industry in the world.

That way is still a better way to build.

- *It gets the job done quickly and efficiently.*
- *It doesn't use your tax money.*
- *It's why Americans today enjoy far more low-price electricity than people anywhere else.*

Since America's Electric Light and Power Companies* are ready, willing and able to provide plenty of power, isn't it wasteful of tax dollars for government to try to do the same job? The government way leads straight downhill to a federal electric power monopoly . . . and socialism.

*Names on request from this magazine

"YOU ARE THERE"—
CBS television—
witness history's
great events

Publisher's Auxiliary. . . . . . . . . . February 12, 1955  
Editor & Publisher . . . . . . . . . . . February 19, 1955  
Broadcasting - Telecasting . . . . . . . February 21, 1955  
American. . . . . . . . . . . . . . . . . . . . . . . . April, 1955  

Reader's Digest . . . . . . . . . . . . . . . . . . . April, 1955  
Saturday Evening Post. . . . . . . . . . . . . April 2, 1955  
U. S. News & World Report . . . . . . . . . April 22, 1955  
Colliers . . . . . . . . . . . . . . . . . . . . . . . April 29, 1955

# Would you call this fair play?

Referee gives "Visitors" a boost —"Home" team has to score on its own. What kind of a game would *that* be?

Ridiculous—yet you and most people face that same kind of unfairness all the time with some of your taxes. These are the taxes you pay in your electric bills.

About 23 cents out of every dollar you pay for electricity goes for taxes. But a strange twist in federal law exempts several million American families and businesses from paying all the taxes in their electric bills that you pay in yours. These are people whose electricity comes from federal government electric systems. You have to help make up the taxes these people don't pay.

Most Americans feel that everyone should pay his fair share of taxes. Don't *you* agree that this special tax favoritism should be made more widely known and given critical study?

*Company names on request through this magazine

America's Independent Electric Light and Power Companies*

Time . . . . . . . . . . . . . . . . . . . . . . . November 4, 1957    Newsweek . . . . . . . . . . . . . . . . November 11, 1957
Saturday Review . . . . . . . . . . . . . . November 9, 1957    Freeman . . . . . . . . . . . . . . . . . . . . . . December, 1957

## STIPULATION OF FACTS

It is hereby stipulated and agreed for the purposes of this action by the parties hereto, by their respective counsel of record, that the following statements are true, reserving the right to either party to introduce further evidence not inconsistent with the facts herein stipulated, and reserving, however, the right to either party to object to any of the facts herein stipulated on the ground that such fact or facts are irrelevant or immaterial:

### I.

#### Jurisdictional Facts

1. This Court has jurisdiction of this action, and this action is within the provisions of Title 28 U.S.C. Sections 1346 (a) (1) and 1402, and it arises under the Internal Revenue Code of the United States.

2. The Plaintiff was at all times material, and is now, a corporation duly organized under the laws of the State of Maine, with its principal place of business located at 212 West Michigan Avenue, in the City of Jackson, County of Jackson, State of Michigan.

3. Plaintiff's taxable year is the calendar year, and for all times herein material, including the calendar years 1954, 1955, 1956 and 1957, it has kept its books of account and filed its U. S. corporation income tax returns on the accrual method of accounting and on the basis of a calendar year.

4. The Plaintiff is, and during the years 1954, 1955, 1956 and 1957 was, a public utility engaged in the production, generation, transmission and distribution of electrical energy, and the production, purchase and distribution of natural gas and is, and during the years 1954, 1955, 1956 and 1957 was, subject to the jurisdiction of the Michigan Public Service Commission.

5. The Plaintiff timely filed its U. S. corporation income tax returns, Form 1120, for the years 1954, 1955, 1956 and 1957, in accordance with extensions of time duly granted, on September 15, 1955, September 14, 1956, September 13, 1957, and August 20, 1958, respectively, and paid Federal income taxes, together with interest thereon, to the said District Director of Internal Revenue for the District of Michigan at Detroit, for such years, as follows:

| Year | Amount |
|------|--------|
| 1954 | $22,106,219.18 |
| 1955 | 25,611,451.34 |
| 1956 | 26,651,342.53 |
| 1957 | 26,275,778.78 |

6. On April 6, 1960, the Plaintiff timely filed a claim for refund, Form 843, for the refund of Federal income tax for the year 1954 in the amount of $24,832.37, together with the interest paid thereon, or such greater amount as is legally refundable, which had been assessed and collected, with the District Director of Internal Revenue, Detroit, Michigan. A true copy of the Plaintiff's claim for refund for the year 1954, is attached to the Complaint as Exhibit A.

7. On August 3, 1962, the Plaintiff received from the District Director of Internal Revenue, Detroit, Michigan, $16,245.32 in partial allowance of its claim for refund for the year 1954, together with interest thereon in the amount of $2,713.23, and on August 14, 1962, the balance of the Plaintiff's claim for refund for Federal income tax for the year 1954 was disallowed and notice thereof was given by certified mail, pursuant to section 6532(a) (1) of the Internal Revenue Code of 1954, as amended, by R. I. Nixon, District Director of Internal Revenue, Detroit, Michigan. A true copy of the notice of disallowance is attached to the Complaint as Exhibit B.

8. On September 10, 1959, the Plaintiff filed a claim for refund, Form 843, for the refund of Federal income tax for the year 1955 in the amount of $962,741.10, or such greater amount as is legally refundable, plus interest of $4,007.50, which had been assessed and collected, with the District Director of

Internal Revenue, Detroit, Michigan. A true copy of the Plaintiff's claim for refund for the year 1955 is attached to the Complaint as Exhibit C.

9. On August 3, 1962, the Plaintiff received from the District Director of Internal Revenue, Detroit, Michigan, $13,808.88 in partial allowance of its claim for refund for the year 1955, together with interest thereon in the amount of $3,632.13, and on August 14, 1962, the balance of the Plaintiff's claim for refund for Federal income tax for the year 1955 was disallowed and notice thereof was given by certified mail, pursuant to section 6532(a) (1) of the Internal Revenue Code of 1954, as amended, by R. I. Nixon, District Director of Internal Revenue, Detroit, Michigan. A true copy of the notice of disallowance is attached to the Complaint as Exhibit D.

10. On September 8, 1960, the Plaintiff timely filed a claim for refund, Form 843, for the refund of Federal income tax for the year 1956 in the amount of $65,837.88, or such greater amount as is legally refundable, plus the interest of $2,538.97 which had been assessed and collected, with the District Director of Internal Revenue, Detroit, Michigan. A true copy of the Plaintiff's claim for refund for the year 1956 is attached to the Complaint as Exhibit E.

11. On August 3, 1962, the Plaintiff received from the District Director of Internal Revenue, Detroit, Michigan, $9,157.03, in partial allowance of its claim for refund for the year 1956, together with interest thereon in the amount of $903.04, and on August 14, 1962, the balance of the Plaintiff's claim for refund for Federal income tax for the year 1956 was disallowed and notice thereof was given by certified mail, pursuant to section 6532(a) (1) of the Internal Revenue Code of 1954, as amended, by R. I. Nixon, District Director of Internal Revenue, Detroit, Michigan. A true copy of the notice of disallowance is attached to the Complaint as Exhibit F.

12. On September 24, 1962, the Plaintiff timely filed a claim for refund, Form 843, for the refund of Federal income tax for the year 1957 in the amount of $195,021.94, or such greater amount as is legally refundable, plus interest thereon, which had been assessed and collected, with the District Director of Internal Revenue, Detroit, Michigan. A true copy of the Plaintiff's claim for refund for the year 1957 is attached to the Complaint as Exhibit G.

13. On September 25, 1962, the Plaintiff's claim for refund for Federal income tax for the year 1957 was disallowed in full and notice thereof was given by certified mail, pursuant to section 6532(a) (1) of the Internal Revenue Code of 1954, as amended, by R. I. Nixon, District Director of Internal Revenue, Detroit, Michigan. A true copy of the notice of disallowance is attached to the Complaint as Exhibit H.

14. This suit was instituted on July 23, 1964, by the Plaintiff for the recovery of the sum of $1,213,483.06, together with interest thereon as provided by law, which had been assessed against and collected from the Plaintiff as Federal income taxes for the taxable years ended December 31, 1954, 1955, 1956 and 1957 by R. I. Nixon, District Director of Internal Revenue for the District of Michigan at Detroit.

15. Except as the Court otherwise expressly orders, if it is determined that the Plaintiff is entitled to recover any amount from the Defendant on its Complaint in this action, the parties will jointly compute the amount of such recovery in accordance with the Court's findings of fact and conclusions of law and submit the amount to the Court for its approval and the entry of a final judgment; in the event that the parties cannot agree as to the amount of such recovery, the Court upon notice and hearing shall determine the amount; and until such amount has been approved or determined by the Court, no final judgment shall be deemed to have been entered in this action.

## II. .

### *Advertising Expense Issue*

16. During the years 1954 through 1957, inclusive, the Plaintiff paid the sums of $47,754.56, $48,587.20, $49,511.31 and $50,522.60 to N. W. Ayer & Son, Inc. N. W. Ayer & Son, Inc. is an advertising agency with offices in New York City.

17. The funds thus paid by the Plaintiff were added to those contributed by approximately 110 other investor-owned electric companies throughout the United States and used in a coordinated program known as the "Electric Companies' Advertising Program" (hereinafter sometimes referred to as "ECAP").

18. Attached hereto and marked Stipulation Exhibit A are copies of all of the magazine advertisements sponsored by ECAP during the year 1954, being 16 advertisements in total, and copies of the advertising portions of all of the scripts used in the television program "You Are There," during the year 1954, being 22 scripts in total.

19. Attached hereto and marked Stipulation Exhibit B are copies of all of the magazine advertisements sponsored by ECAP during the year 1955, being 19 advertisements in total, and copies of the advertising portions of all of the scripts used in the television program "You Are There," during the year 1955, being 20 scripts in total.

20. Attached hereto and marked Stipulation Exhibit C are copies of all of the magazine advertisements sponsored by ECAP during the year 1956, being 34 advertisements in total.

21. Attached hereto and marked Stipulation Exhibit D are copies of all of the magazine advertisements sponsored by ECAP during the year 1957, being 29 advertisements in total.

22. During the years 1954 through 1957, N. W. Ayer & Son, Inc. expended ECAP funds as enumerated on page 1 of Stipulation Exhibits A, B, C and D.

23. Plaintiff paid the amounts set forth in paragraph 16 to N. W. Ayer & Son, Inc., pursuant to a letter agreement dated March 24, 1942, a copy of which is attached hereto and marked Stipulation Exhibit E, and pursuant to a further letter agreement dated October 7, 1942, a copy of which is attached hereto and marked Stipulation Exhibit F. During the taxable years 1954 through 1957, these agreements remained in effect.

24. Attached hereto and marked Stipulation Exhibits G, H, I and J are lists of the investor-owned electric companies which participated in ECAP in each of the years 1954, 1955, 1956 and 1957, respectively, together with the amounts of their contributions. Each company participating in the ECAP program entered into an agreement with N. W. Ayer & Son, Inc., whereunder the participant agreed to make payments in support of the program on an established rate basis applicable to all participating companies. In the years 1954, 1955, 1956 and 1957 the rate basis was as follows: For the first 100,000 customers, each 10¢; for the next 100,000 customers, each 8½¢; for the next 200,000 customers, each 7¢; for the next 200,000 customers, each 5½¢; for excess over 600,000 customers, each 4¢ (subject to a maximum of $55,000 from any one electric operating company). Payments were based on the number of customers reported to the Federal Power Commission as of December 31 of the second preceding year.

25. During the years 1954 through 1957, inclusive, representatives of companies participating in ECAP attended "Management Group" and "Copy Group" meetings of ECAP, as set forth in Stipulation Exhibits K, L, M and N, respectively.

26. The amounts designated as "Survey" on page 1 of Stipulation Exhibits B and D were expended for public opinion surveys conducted by Opinion Research Corporation, of Princeton, New Jersey. Attached hereto and marked Stipulation Exhibits O and P are the reports made

by Opinion Research Corporation as a result of the 1955 and 1957 surveys, respectively. Similar surveys had been made biennially, beginning in 1943, for ECAP by Opinion Research Corporation. Attached hereto and marked Stipulation Exhibits Q and R are the reports made by Opinion Research Corporation as a result of the 1943 and 1953 surveys, respectively. A copy of a report of an additional survey during 1957 by Opinion Research Corporation for ECAP entitled "Readers' Reactions to Four ECAP Advertisements" is attached hereto and marked Stipulation Exhibit S.

27. Attached hereto and marked Stipulation Exhibit T is a schedule setting forth the Plaintiff's share of the cost of each magazine advertisement, the television programs, and other costs set forth on page 1 of Exhibits A, B, C and D. Exhibit T also sets forth the amount of the Plaintiff's share of such costs which the Defendant allowed as an ordinary and necessary business expense and the amount which the Defendant disallowed.

28. Upon original examination of Plaintiff's income tax return for the year 1954, the Defendant did not disallow the deduction of any portion of the amount paid by Plaintiff to N. W. Ayer & Son, Inc. for ECAP in 1954. Upon a subsequent reexamination, Defendant disallowed the deduction of the entire amount paid for 1954. Upon the original examination of the income tax returns of Plaintiff for the years 1955 and 1956, the Defendant disallowed the deduction of the entire amount paid by the Plaintiff to N. W. Ayer & Son, Inc. for ECAP for those years. Accordingly, the Defendant determined a deficiency in Plaintiff's income taxes for the years 1954 through 1956, inclusive, based upon the disallowance of the deduction of the entire amount of payments to N. W. Ayer & Son, Inc. for ECAP. Plaintiff paid the said deficiencies and filed claims for refund with the Defendant, claiming that the disallowance of the deduction of the

said ECAP expenditures was erroneous and illegal.

29. On October 5, 1961, the District Director of Internal Revenue, Detroit, Michigan, mailed a letter to Plaintiff, a copy of the said letter which is attached hereto and marked Stipulation Exhibit U. The said letter was sent by the District Director pursuant to a memorandum dated January 17, 1961, from the Assistant Commissioner, Technical, to the Assistant Commissioner, Operations, Internal Revenue Service. A copy of said memorandum is attached hereto and marked Stipulation Exhibit V.

30. Thereafter, the Defendant partially allowed Plaintiff's claims for refund for the years 1954, 1955 and 1956, but continued to disallow the deduction of the following portions of Plaintiff's payments to N. W. Ayer & Son, Inc. for ECAP:

| | |
|------|--------|
| 1954 | 27.88% |
| 1955 | 38.55% |
| 1956 | 61.30% |

The balance of the payments in question were allowed by Defendant as a business expense under section 162 of the Internal Revenue Code, and an appropriate refund of taxes and interest was made to the Plaintiff.

31. Also, on October 6, 1961, Defendant determined that the deduction of 43.09% of Plaintiff's payments to N. W. Ayer & Son, Inc. for ECAP for the taxable year 1957 should be disallowed. The deficiency thus determined by the Defendant was paid by Plaintiff, and a claim for refund was filed, on the ground that disallowance of the deduction of the said ECAP expenditures was erroneous and illegal. On September 25, 1962, Defendant denied Plaintiff's claim for refund.

32. Set forth below for each of the years 1954 through 1957, inclusive, are (1) the amounts paid to N. W. Ayer & Son, Inc. for ECAP and claimed as a

deduction by Plaintiff, (2) the amounts originally allowed by Defendant, (3) the amounts finally allowed by Defendant, and (4) the amounts still in controversy:

| Taxable Year | (1) Paid and Claimed | (2) Originally Allowed | (3) Finally Allowed | (4) Still in Controversy |
|---|---|---|---|---|
| 1954 | $47,754.56 | $47,754.56 | $34,440.59 | $13,313.97 |
| 1955 | 48,587.20 | –0– | 29,856.83 | 18,730.37 |
| 1956 | 49,511.31 | –0– | 19,160.88 | 30,350.43 |
| 1957 | 50,522.60 | 28,752.41 | 28,752.41 | 21,770.19 |

33. Attached hereto and marked Stipulation Exhibits W, X, Y and Z are copies of four advertisements which appeared in the following publications:

| Exhibit | Publication | Date |
|---|---|---|
| W | Detroit Free Press | 6/11/57 |
| X | New York Times | 10/1957 |
| Y | New York Times | 11/17/57 |
| Z | Fortune Magazine | 10/1957 |

———◆———

Attached hereto and marked Stipulation AA is a copy of a booklet published by the Tennessee Industrial and Agricultural Development Commission, and referred to in Exhibit Y. Attached hereto and marked Stipulation Exhibit FFF is a copy of a letter dated December 14, 1956, from D. E. Karn, who was then the President of the Plaintiff, to the Plaintiff's employees.

III.

*Death Benefit Issue*

34. Prior to the taxable year 1955, Plaintiff had in force an insured death benefit plan under the terms of which Plaintiff paid regular periodic premiums to an insurance company, in return for which the insurance company contracted to pay a specified death benefit up to a maximum of $2,000 to the designated beneficiaries of each of the employees or retired employees of the Plaintiff who had retired at the normal retirement age of 65, upon their death. The premiums so paid were deducted by the Plaintiff in its income tax returns and allowed as deductions by Defendant.

35. On or about March 1, 1955, the Plaintiff experienced a labor dispute with the Utility Workers of America—CIO. As a result of the dispute, the Governor of the State of Michigan appointed a Special Commission to make recommendations concerning the settlement of the dispute. Attached hereto and marked Stipulation Exhibit BB are the portions of the findings and recommendations of the Special Commission submitted to the Governor on May 13, 1955, consisting of pages 1 and 45, which are pertinent to the issue herein.

36. On May 18, 1955, the Plaintiff agreed, in writing, with the Utility Workers' Union that with respect to employees within the bargaining unit:

"This will confirm our understanding that the Company will provide life insurance or death benefits of $1,000.00 for all retired or retiring employees as recommended by the Governor's Special Fact Finding Commission, retroactive to March 1, 1955."

This agreement remained in effect through December 31, 1957.

37. On September 22, 1955, the Plaintiff's Board of Directors approved a death benefit plan for all full-time regular employees. A copy of the minutes of the meeting of the Board of Directors of September 22, 1955, is attached hereto and marked Stipulation Exhibit CC, and a copy of the plan is attached hereto and marked Stipulation Exhibit DD. A copy of Exhibit DD was distributed by Plaintiff to each employee during 1955, and to each new employee thereafter, upon his entering employment. The plan as thus adopted remained in effect through December 31, 1957, and, with an increase in the benefit to $1,500 as of January 1, 1961, the plan is still in effect.

38. During the years 1955, 1956 and 1957, each new employee of the Plaintiff has been given a Handbook For New Employees upon entering employment, a copy of which handbook is attached hereto and marked Stipulation Exhibit EE.

39. Attached hereto and marked Stipulation Exhibit FF is a specimen copy of a death benefit certificate delivered to each employee who has retired from the Plaintiff's employ since March 1, 1955.

40. Attached hereto and marked Stipulation Exhibit GG is a schedule showing, as of the end of each of its taxable years 1955, 1956 and 1957, (1) the total number of employees covered by the death benefit plan, (2) their year of birth, and (3) their sex.

41. During the years 1955, 1956 and 1957, Plaintiff delivered death benefit certificates to its regular full-time employees retiring at or after age 65 as follows:

| Year | Number of Certificates Issued | Face Amount |
|------|-------------------------------|-------------|
| 1955 | 104 | $92,800.00 |
| 1956 | 72 | 79,000.00 |
| 1957 | 64 | 68,000.00 |

Attached hereto and marked Stipulation Exhibit HH is a schedule setting forth the name, sex, date of retirement and face amount of the certificate delivered to each retiring employee in each of the years 1955, 1956 and 1957.

42. Attached hereto and marked Stipulation Exhibit II is a schedule setting forth the death benefit certificates outstanding at the end of each of the years 1955, 1956 and 1957, by age, sex, and the face amount of the certificate of the retired employee to whom the certificate was delivered.

43. During the years 1955, 1956 and 1957, death benefit certificates were delivered to 5, 2 and 2 employees, respectively, upon their retirement before age 65 because of total and permanent disability. Plaintiff does not claim any accrued expense with respect to the delivery of any of these certificates, and it is agreed that a deduction has been allowed with respect to these certificates to the extent that payment was actually made on the employee's death in 1955, 1956 and 1957. These certificates have been eliminated from the figures set forth in Stipulation Exhibits HH and II, so that the only amounts in controversy in this case are those attributable to certificates delivered upon normal retirement at or after age 65.

44. When a person who has previously been retired because of disability before age 65 is still disabled at age 65, for the purposes of Exhibits HH and II, that person is considered as having received a new death benefit certificate upon reaching age 65, to replace the certificate originally delivered to him. If a person who has been retired because of disability before age 65 is reemployed by the Plaintiff, for the purposes of Stipulation Exhibits HH and II, that person is considered as having received a death benefit certificate when he retires at or after age 65.

45. During the years 1955, 1956 and 1957, Plaintiff paid the following amounts by virtue of the death of holders of death benefit certificates:

| Year | Amount Paid | |
| | Under Age 65 | Over Age 65 |
| --- | --- | --- |
| 1955 | –0– | $2,000 |
| 1956 | 4,000 | 4,900 |
| 1957 | –0– | 3,500 |

In its income tax returns for the years 1955, 1956 and 1957, Plaintiff deducted the above amounts, and those deductions were allowed by the Defendant. Plaintiff claims that it should have claimed, and should have been allowed, in addition to amounts paid by reason of death of individuals prior to age 65, deductions in the amounts of $1,802,838, $87,685 and $53,277 for the years 1955, 1956 and 1957, respectively, being the amounts claimed by Plaintiff to be the annual increase in its actuarial liabilities under the death benefit plan. In the alternative, Plaintiff claims deductions in the amounts set forth in paragraph 41 above. As a second alternative, Plaintiff claims deductions in the amounts of $61,641, $50,092, and $44,491 for the years 1955, 1956 and 1957, respectively, being the amounts claimed by Plaintiff to be the annual increase in the present values of the liabilities of the Plaintiff under the death benefit certificates then actually delivered and outstanding, as set forth in Exhibit II.

46. During the years 1955, 1956 and 1957, Plaintiff accrued no liability on its books of account with respect to the death benefit plan. Starting in the taxable year 1961, a reserve was created on the Plaintiff's books with respect to the death benefit plan. This reserve had the following balances as of the end of the years 1961 through 1964, respectively:

| December 31 | Balance |
| --- | --- |
| 1961 | $295,600 |
| 1962 | 580,600 |
| 1963 | 550,456 |
| 1964 | 610,990 |

47. Attached hereto and marked Stipulation Exhibit JJ are the balance sheets of the Plaintiff as of the end of each of its taxable years 1955, 1956 and 1957.

## IV.

### Depreciation Issue

### A. Electric Transmission Line Clearing Costs

48. During the taxable year 1957, Plaintiff operated 43 electric generating plants, located at various places in the lower peninsula of Michigan, as set forth in Stipulation Exhibit KK, attached hereto. Exhibit KK also shows additional plants placed in service and plants retired from service between December 31, 1957, and December 31, 1965.

49. In order to transmit electric power from its generating plants to its customers, Plaintiff maintained electric transmission and distribution lines.

50. Under Plaintiff's methods of plant accounting, power lines which carry 22,000 volts or more are classified as transmission lines. Those which carry less than 22,000 volts are classified as distribution lines.

51. Attached hereto and marked Stipulation Exhibit LL is a map showing Plaintiff's electric generating and transmission system as it existed during the year 1957.

52. Upon construction of an electric transmission line, which includes the installation of towers, poles and conductors on the Plaintiff's right-of-way, Plaintiff is required to clear the right-of-way of timber, brush, boulders and other objects.

53. Attached hereto and marked Stipulation Exhibit MM are three photographs showing representative electric transmission line rights-of-way after clearing and erection of towers, poles and conductors.

54. The costs of initial clearing in connection with the installation of electric trasmission lines are charged by Plaintiff to "Clearing Land and Rights-of-Way" on Plaintiff's books. Prior to January 1, 1961, this account was No. 341. Effective January 1, 1961, the account number was changed to 351. Expenses incurred in maintainig the clearing, subsequent to the initial clearing, are charged to expense as incurred.

55. The adjusted basis under section 167(g) of the Internal Revenue Code of 1954 of Plaintiff's electric transmission line clearing costs as of January 1, 1957, and as of December 31, 1957, was $3,948,-003 and $4,303,596, respectively. The average adjusted basis for the taxable year 1957 was $4,125,800.

56. Attached hereto and marked Stipulation Exhibit NN is a schedule showing the yearly additions and retirements to the electric transmission line clearing costs account for each of the years 1904 through 1964, inclusive.

57. Attached hereto and marked Stipulation Exhibit OO is a schedule showing the yearly retirements of electric transmission line clearing costs, identified by year of addition to plant in service, for the years 1914–1964, and the reasons for retirement for the years 1948 through 1964.

58. During the year 1957, the average useful life, as claimed by Plaintiff and allowed by Defendant, for depreciation purposes for Plaintiff's electric transmission line towers, poles and conductors, and Plaintiff's electric distribution poles and conductors, together with the weighted average of these accounts, were as follows:

| | Useful Life | |
| Asset Group | Transmission | Distribution |
| --- | --- | --- |
| Towers | 53.0 Years | None in use |
| Poles | 32.9 " | 28.5 Years |
| Conductors | 47.0 " | 41.0 " |
| Weighted Average | 43.0 " | 34.0 " |

59. On January 14, 1955, the Michigan Public Service Commission entered an order in Case No. D-875-55.1, "In the Matter of the Application of CONSUMERS POWER COMPANY for Approval of Depreciation Practices." A true copy of the said order is attached hereto and marked Stipulation Exhibit PP. In support of its application for approval of depreciation practices, Plaintiff submitted certain engineering data to the Public Service Commission. A copy of the data pertaining to electric transmission line clearing costs is attached hereto and marked Stipulation Exhibit QQ.

60. On June 17, 1965, the Michigan Public Service Commission entered an order in Case No. U-1780, "In the Matter of the Application of CONSUMERS POWER COMPANY for Approval of Depreciation Practices." A true copy of the said order is attached hereto and marked Stipulation Exhibit RR. In support of its application for approval of depreciation practices, Plaintiff submitted certain engineering data to the Public Service Commission. A copy of the data pertaining to electric transmission line clearing costs and electric transmission easements is attached hereto and marked Stipulation Exhibit SS. A copy of the data pertaining to electric distribution easements is attached hereto and marked Stipulation Exhibit TT. A copy of the

data pertaining to gas distribution easements is attached hereto and marked Stipulation Exhibit UU.

61. Beginning January 1, 1955, and to the present time, the Plaintiff has depreciated its electric transmission line clearing costs on its books using an average useful life of 75 years, in accordance with the order of the Michigan Public Service Commission dated January 14, 1955 (Stipulation Exhibit PP, above).

62. In its income tax returns for the year 1957 and prior years, the Plaintiff claimed and was allowed, deductions in the amount of the "retirements during the year," as shown in Exhibit NN. During this period, the Defendant would not allow any deduction for depreciation of electric transmission line clearing costs. Plaintiff claims that it should have claimed, and should have been allowed, a deduction in the amount of $121,365 for the year 1957, representing depreciation of electric transmission line clearing costs over the 43-year weighted average life of the electric transmission line towers, poles and conductors. In the alternative, Plaintiff claims that it should have claimed, and should have been allowed, a deduction in the amount of $69,827 for the said year, representing depreciation of electric transmission line clearing costs over the average useful life of 75 years determined by the Michigan Public Service Commission.

### B. Electric Transmission Easements

63. During the year 1957, Plaintiff's electric transmission lines covered approximately 5,525 miles. Approximately 775 miles of the transmission lines were located on land owned by Plaintiff in fee. Approximately 350 miles were located on public roads. The remainder or approximately 4,400 miles, were located on rights-of-way in the form of easements.

64. A copy of a typical such easement, as granted in 1956, is attached hereto and marked Stipulation Exhibit VV.

65. As of January 1, 1957, and December 31, 1957, respectively, Plaintiff owned 21,905 and 22,255 easements for electric transmission purposes.

66. The average adjusted basis under section 167(g) of the Internal Revenue Code of 1954 of the electric transmission easements owned by Plaintiff during the taxable year 1957 was $5,075,644.

67. The costs of acquiring electric transmission easements are charged by Plaintiff to "Electric Transmission Land Rights (Easements)" on Plaintiff's books. Prior to January 1, 1961, this account was No. 340.2. Effective January 1, 1961, the account number was changed to 350.2. Attached hereto and marked Stipulation Exhibit WW is a schedule showing the yearly additions to and retirements from electric transmission easements for the years 1902 through 1964.

68. Attached hereto and marked Stipulation Exhibit XX is a schedule showing the yearly retirements of electric transmission easements, identified by year of addition to plant in service.

69. Beginning January 1, 1965, to the present time, Plaintiff has depreciated its cost of electric transmission easements on its books over an average useful life of 75 years, in accordance with the order of the Michigan Public Service Commission dated June 17, 1965 (Stipulation Exhibit RR).

70. In its income tax returns for 1957 and prior years, the Plaintiff claimed and was allowed no deduction for retirements of electric transmission easements. During this period, the Defendant would not have allowed any deduction for depreciation of electric transmission easements, but would have allowed deductions for the retirements during the year shown by Exhibit WW. Plaintiff claims that it should have claimed, and should have been allowed, a deduction in the amount of $138,899 for the year 1957, representing depreciation of electric transmission easements over the 43-year weighted average life of electric transmission line towers, poles and conductors. In the alternative, Plaintiff claims that it should have claimed, and should have been al-

lowed a deduction in the amount of $79,-835 for the said year, representing depreciation of electric transmission easements over an average useful life of 75 years, as determined by the Michigan Public Service Commission.

## C. *Electric Distribution Easements*

71. During the year 1957, Plaintiff's electric distribution lines covered approximately 36,341 miles. A portion of the 36,341 miles was located on rights-of-way in the form of easements. A copy of a typical such easement, as granted in 1956, is attached hereto and marked Stipulation Exhibit VV.

72. The average adjusted basis under section 167(g) of the Internal Revenue Code of 1954 of Plaintiff's electric distribution easements owned by Plaintiff during the taxable year 1957 was $4,-631,877.

73. The costs of acquiring electric distribution easements are charged by Plaintiff to "Electric Distribution Land Rights (Easements)" on Plaintiff's books. Prior to January 1, 1961, this account was No. 350.2. Effective January 1, 1961, the account number was changed to 360.2. Attached hereto and marked Stipulation Exhibit YY is a schedule showing the yearly additions to electric distribution easements from 1915 through 1964.

74. The electric distribution easements described above are exclusive of so-called "street franchises," which are furnished to the Plaintiff free of charge by municipalities who have granted to the Plaintiff franchises which give the Plaintiff the right to use public thoroughfares for electric distribution purposes.

75. Attached hereto and marked Stipulation Exhibit ZZ are the cover page and pages 11, 60, 61, 62, 63 and 66 of "Bulletin F," as published by the Internal Revenue Service in January 1942. Attached hereto and marked Stipulation Exhibit AAA are pages 1, 50, 51, 52, 53 and 56 of "Bulletin F," as published by the Internal Revenue Service in 1955 and in effect during the year 1957.

76. Attached hereto and marked Stipulation Exhibit BBB is a copy of an agreement for the joint use of poles between Plaintiff and Michigan Bell Telephone Company, dated July 28, 1932, which agreement was in effect during the year 1957.

77. The average number of poles owned by the Plaintiff and in service for electric transmission and distribution purposes during the taxable year 1957 was 905,527.

78. During the year 1957, 143,065 of the Plaintiff's poles were used by Michigan Bell Telephone Company for the purpose of carrying its telephone lines under the Joint Use Agreement.

79. In addition, in 1957, 114,790 of the telephone poles owned by Michigan Bell Telephone Company were used by Plaintiff for the purpose of attaching its electric lines under the Joint Use Agreement.

80. In addition, during the year 1957, similar joint use agreements were in effect between Plaintiff and other telephone companies operating in the area served by Plaintiff, and similar joint use agreements were in effect between electric utilities and telephone companies throughout the United States.

81. Beginning January 1, 1965, to the present time, Plaintiff has depreciated its cost of electric distribution easements on its books over an average useful life of 50 years, in accordance with the order of the Michigan Public Service Commission dated June 17, 1955 (Stipulation Exhibit RR).

82. In its income tax returns for 1957 and prior years, the Plaintiff claimed and was allowed no deduction for retirements of electric distribution easements. During this period, the Defendant would not have allowed any deduction for depreciation of electric distribution easements, but would have allowed deductions for any retirements during the year. Plaintiff claims that it should have claimed, and should have been allowed, a deduction

in the amount of $160,814 for the year 1957, representing depreciation of electric distribution easements over the 34-year weighted average life of electric distribution line poles and conductors. In the alternative, Plaintiff claims that it should have claimed, and should have been allowed a deduction in the amount of $109,684 for the said year, representing depreciation of electric distribution easements over an average useful life of 50 years, as determined by the Michigan Public Service Commission.

### D. *Gas Distribution Easements*

83. During the taxable year 1957, Plaintiff secured natural gas from three principal sources: (1) its natural gas wells, located in various portions of the State of Michigan, (2) purchases from gas producers located in various portions of the State of Michigan, and (3) purchases within the State of Michigan (through a subsidiary) from a natural gas pipe line company, the source of which was outside the State of Michigan.

84. In order to transmit gas from its sources to its customers, Plaintiff maintained gas distribution mains, all of which were located in the State of Michigan.

85. Attached hereto and marked Stipulation Exhibit CCC is a map showing Plaintiff's intercity integrated natural gas distribution system as it existed during the year 1957.

86. During the year 1957, Plaintiff's gas distribution mains covered approximately 6,663 miles. During the year 1957, the average useful life, as claimed by Plaintiff and allowed by Defendant for depreciation purposes for Plaintiff's gas distribution mains, was 43 years.

87. During the taxable year 1957, Plaintiff owned approximately 4,000 easements for gas distribution purposes. A copy of a typical gas distribution easement, granted in 1957, is attached hereto and marked Stipulation Exhibit DDD.

88. The gas distribution easements described above are exclusive of so-called "franchise rights," which are furnished to the Plaintiff free of charge by municipalities who have granted to the Plaintiff franchises, and which give the Plaintiff the right to use public thoroughfares for gas distribution purposes.

89. The average adjusted basis under section 167(g) of the Internal Revenue Code of 1954 for computing depreciation of the gas distribution easements owned by Plaintiff for the taxable year 1957 was $243,294.

90. The costs of acquiring gas distribution easements are charged by Plaintiff to "Gas Distribution Land Rights" on Plaintiff's books. Prior to January 1, 1961, this account was No. 364. Effective January 1, 1961, the account number was changed to 374. Attached hereto and marked Stipulation Exhibit EEE is a schedule showing the yearly additions to and retirements from gas distribution easements for the years 1922 through 1964.

91. Attached hereto and marked Stipulation Exhibit GGG is a schedule showing the yearly retirements of gas distribution easements, identified by year of acquisition.

92. Beginning January 1, 1965, to the present time, Plaintiff has depreciated its cost of gas distribution easements on its books over an average useful life of 65 years, in accordance with the order of the Michigan Public Service Commission dated June 17, 1965 (Stipulation Exhibit RR).

93. In its income tax returns for 1957 and prior years, the Plaintiff claimed and was allowed no deduction for retirements of gas distribution easements. During this period, the Defendant would not have allowed any deduction for depreciation of gas distribution easements, but would have allowed deductions for any retirements during the year. Plaintiff claims that it should have claimed, and should have been allowed, a deduction in the amount of $7,063 for the year 1957, representing depreciation of gas distribution easements over the 43-year average life of gas distribution mains. In the alternative, Plaintiff claims that it should

have claimed, and should have been allowed a deduction in the amount of $4,686 for the said year, representing depreciation of gas distribution easements over an average useful life of 65 years, as determined by the Michigan Public Service Commission.

### E. *Easements—General*

94. From time to time in the course of Plaintiff's business, Plaintiff removes its poles, towers, conductors and other appurtenant equipment from an electric transmission or electric distribution easement. As a matter of Plaintiff's company practice, if the Plaintiff subsequently wants to relocate poles, towers, conductors or other appurtenant equipment over the same property, or under the same property by underground conduit or cable, it acquires a new easement.

95. From time to time in the course of Plaintiff's business, Plaintiff relocates a portion of its gas distribution mains. When such relocation occurs, Plaintiff sometimes removes its gas mains and other appurtenant equipment from an easement and sometimes leaves the mains in place. In either event, as a matter of company practice, if the Plaintiff subsequently wants to relocate the gas main over the same property, it acquires a new easement.

96. All of the electric transmission, electric distribution and gas distribution easements owned by Plaintiff are located within and subject to the laws of the State of Michigan.

97. Upon the retirement of an electric transmission easement, electric distribution easement or gas distribution easement, Plaintiff realizes no salvage for the purposes of determining depreciation under the provisions of section 167 of the Internal Revenue Code of 1954.

> (s) Clifford H. Domke
> Counsel for Plaintiff
>
> Lawrence Gubow
> United States Attorney
>
> By (s) Donald R. Anderson
> Attorney, Tax Division
> Department of Justice
> Counsel for Defendant

### SUPPLEMENTAL STIPULATION OF FACTS

It is hereby stipulated and agreed for the purposes of this action by the parties hereto, by their respective counsel of record, that the following statements are true, reserving the right of either party to introduce further evidence not inconsistent with the facts herein stipulated, and reserving the right to either party to object to any of the facts herein stipulated on the ground that such fact or facts are irrelevant or immaterial:

98. Attached hereto and marked Exhibits PPP, QQQ, RRR and SSS are the Annual Reports of the Plaintiff to its stockholders for the years 1954, 1955, 1956 and 1957, inclusive, respectively.

99. Attached hereto and marked Exhibit TTT is a copy of a pamphlet issued by the Tennessee Valley Authority, Division of Power Utilization, entitled "Industrial Development in the TVA area during 1957."

100. With respect to Plaintiff's death benefit plan, Plaintiff's second alternative position, as set forth in Paragraph 45 of the Stipulation of Facts, is computed by determining the annual increase in the present values of the liabilities of the Plaintiff under the death benefit certificates then actually delivered and outstanding, as set forth in Exhibit II, plus the death benefits actually paid during each year.

101. Attached hereto and marked Exhibit UUU is a schedule setting forth retirements of the Plaintiff's electric steam and hydro generating plant prior to 1957.

102. Attached hereto and marked Exhibit VVV is a copy of the following pages of the Uniform System of Accounts as prescribed for the Plaintiff's electric operations by the Michigan Public Service Commission in the years 1954 through 1957, inclusive: Flyleaf, pages 4–17, 37–55, 69–75, 87–89, 102–109, 124–125, 127–129.

103. Attached hereto and marked Exhibit WWW is a copy of the following pages of the Uniform System of Ac-

counts for Gas Utilities prescribed for the Plaintiff's gas operations by the Michigan Public Service Commission in the years 1954 through 1957, inclusive: Flyleaf, pages 2–19, 47–71, 85–88, 102–107, 123–127, 152–157.

104. Attached hereto and marked Exhibit XXX is a schedule showing the manner in which the average useful life of 43 years for gas distribution mains (referred to in Paragraph 86 of the Stipulation) was arrived for income tax purposes.

> (s) Clifford H. Domke
> Counsel for Plaintiff
>
> Lawrence Gubow
> United States Attorney

> By (s) Donald R. Anderson
> Attorney, Tax Division
> Department of Justice
> Counsel for Defendant